Faye FULLER, Administratrix of the Estate
of Maggie LONG, Deceased *v.* C. W. STARNES, M.D.

79-334                                        597 S.W. 2d 88
Supreme Court of Arkansas
Opinion delivered April 21, 1980

*Parker, Henry & Walden,* by: *Troy Henry,* for appellant.

*Barrett, Wheatley, Smith & Deacon,* for appellee.

RICHARD L. MAYS, Justice. This appeal is from a judg-

ment entered by the trial judge in a medical malpractice action after directing a verdict in favor of the defendant, Dr. C. W. Starnes, at the conclusion of plaintiff's case in chief. Although plaintiff alleged that Dr. Starnes was negligent in prescribing Demerol to relieve pain of her late mother without disclosing adequate information about the perils of its use, plaintiff did not produce expert medical evidence to establish a disclosure standard for the jury to assess the reasonableness of Dr. Starnes' conduct. The trial judge concluded that this evidentiary omission was fatal to plaintiff's case. On appeal plaintiff argues that, even without expert testimony concerning any professional disclosure standard, sufficient evidence regarding medical facts which Dr. Starnes did not disclose was presented for the jury to assess the reasonableness of his conduct, especially if the court adopts a standard measured by the patient's informational needs.

The facts are essentially undisputed. Plaintiff, Fay Fuller, took her 86 year old mother, Maggie Long, to the emergency room at St. Bernard's Regional Medical Center in Jonesboro, Arkansas, at approximately 2:10 a.m. on September 25, 1976, after her mother complained of sharp pains in her left side and her temperature reached 102 degrees. Mrs. Long was seen by Dr. C. W. Starnes, a full time physician at the hospital, who, after concluding that she had pleurisy, indicated that he would give her Penicillin and something for her pain. Although Dr. Starnes asked if Mrs. Long was allergic to any medication, he did not tell her or her daughter what he was going to give her for pain. After Procaine Penicillin was administered to Mrs. Long for her pleuritic condition, she was given 25 mg. of Demerol with 25 mg. of Phenegran in the hip for the relief of pain. Dr. Starnes had at first prescribed 50 mg. of both Demerol and Phenegran but reduced the dosage before the injection occurred.

Demerol is a narcotic analgesic given to relieve pain and Phenegran is given with Demerol to decrease any incidence of nausea which is sometimes associated with Demerol. When Demerol is given along with Phenegran the activity of Demerol may be increased by approximately 50%, so that an injection of 25 mg. of Demerol and Phenegran would equal,

in effect, 37.5 mg. of Demerol. The usual adult dosage of Demerol ranges from 50 to 150 mg.

Although Dr. Starnes advised Mrs. Long to wait in the emergency room to see if she might have a reaction to the medication, he did not inform Mrs. Long or Mrs. Fuller of risks known to be associated with the use of Demerol, such as nausea, vomiting, respiratory depression and decreased blood pressure.

Approximately 20 minutes after the injections, Mrs. Long began having difficulty breathing and eventually stopped breathing. Emergency procedures revived Mrs. Long, but she remained in St. Bernard's coronary care unit for 17 days after which she was discharged with permanent brain damage. Some two years later she died, apparently from natural causes, on October 18, 1978.

Although the existence of a physician's duty to warn a patient of hazards of future medical treatment is generally recognized, a wide divergence of views has developed concerning the appropriate standard for measuring the scope of the duty. The minority view is that the duty of a physician to disclose is measured by the patient's need for information material to the patient's right to decide whether to accept or reject the proposed medical treatment. See, e.g. *Canterbury* v. *Spence,* 464 F. 2d 772 (D.C. App. 1972) cert. denied, 409 U.S. 1064, 93 S. Ct. 560, 34 L. Ed. 2d 518 (1973); *Cobbs* v. *Grant,* 104 Cal. Rptr. 505, 502 P. 2d 1 (1972); *Wilkinson* v. *Vesey,* 110 R.I. 606, 295 A. 2d 676 (1972). Emphasizing the right of the patient to control what happens to his body, the minority view is undergirded by the proposition that what a patient should be told about future medical treatment is primarily a human judgment. The majority view is that the duty of a physician to disclose is measured by the customary disclosure practices of physicians in the community or in a similar community. See, e.g. *Govin* v. *Hunter,* 374 P. 2d 421 (Wyo. 1962), *Green* v. *Hussey,* 127 Ill. App. 2d 174, 262 N.E. 2d 156 (1970). This view emphasizes the interest of the medical profession to be relatively free from vexatious and costly litigation and holds that what a patient should be told about future medical treatment is primarily a medical decision. Relying on the

minority view, plaintiff argues that since Dr. Starnes admittedly did not disclose to Mrs. Long certain known risks associated with the use of Demerol, a jury, applying a reasonable patient standard, could properly conclude that Dr. Starnes breached his duty to disclose material information to the patient, irrespective of any medical testimony concerning professional medical standards. Even if we were to adopt this view, we would still find great difficulty reversing the trial judge on the basis of the proof in this case. Although the plaintiff established certain known risks associated with the use of Demerol, plaintiff presented no medical evidence concerning their incidence of occurrence or the existence and feasibility of alternative treatment. Such evidence is crucial to the jury's determination of the materiality of the defendant's failure to disclose. *Napier v. Northrum,* 264 Ark. 406, 572 S.W. 2d 153 (1978). Therefore, even under the minority view, medical evidence may be necessary for a jury to appreciate the significance of what was not disclosed and to understand the nature of its irresponsibility.

Although the plaintiff would probably not prevail if the minority view were adopted, we feel obliged to adopt the majority view and, therefore, hold that the physician's duty to disclose risks is measured by the customary practice of physicians in the community in which he practices or in a similar community.

We are persuaded by a recent legislative expression which adopts the majority view, effective April 12, 1979: Act 709 of 1979. We perceive no valid purpose in adopting a policy inconsistent with that recently expressed by the legislature to control the facts in this case even though they developed before the legislature formally adopted a physician's disclosure standard measured by the customary practices of the community physicians. As the trial judge properly recognized, this disclosure standard always requires expert medical testimony for the jury to determine whether a physician's failure to disclose constitutes a breach of his duty to disclose.

Affirmed.

FOGLEMAN, C.J., concurs.

JOHN A. FOGLEMAN, Chief Justice, concurring. I respectfully concur in the affirmance in this case, but for an entirely different reason from that given by the majority.

I think the trial court properly excluded the proffered testimony of the two daughters of Maggie Long in response to the following question:

> Knowing your mother as well as a daughter could know her, do you think your mother in her right mind would have consented had she known the risks involved with Demerol?

A proffer was made to the effect that each would have answered that, in her opinion, her mother would not have consented, if informed of the risk of Demerol concerning respiratory depression. I do not think that it was ever intended that Rule 701, Ark. Stat. Ann. § 28-1001 (Repl. 1979) be so comprehensive as to encompass any such speculative answer as this. It is not at all reasonable to me to classify this opinion or inference as one rationally based upon the perception of the witness. Appellants have cited no authority to support their contention that it is admissible and I find none.

Since this evidence is not admissible, I find no evidence that Mrs. Long, who was suffering considerable pain, would not have submitted to the injection of the medication had Dr. Starnes discussed the possible risks and alternatives. In the absence of such evidence, the necessary proof of proximate cause was absent. *Aetna Casualty & Surety Co. v. Pilcher,* 244 Ark. 11, 424 S.W. 2d 181. See also, *Shetter v. Rochelle,* 2 Ariz. App. 358, 409 P. 2d 74 (1965), modified on another point, 2 Ariz. App. 607, 411 P. 2d 45 (1966); *Wilkinson v. Veasey,* 110 R.I. 606, 295 A. 2d 676, 69 ALR 3d 1202 (1972); *Beauvais v. Notre Dame Hospital,* 387 A. 2d 689 (R.I. 1978); *Poulin v. Zartman,* 542 P. 2d 251 (Alaska, 1975) affirmed on rehearing, 548 P. 2d 1299 (1976).

Since there was this deficiency in the evidence, the granting of a directed verdict was proper. Under this view, it would

be unnecessary to decide the question of the necessity of medical testimony as · to standards with regard to a physician's informing his patient of risks, and I feel that the decision of that question should be foregone at this time. There are very valid and persuasive arguments on both sides of the question, and the majority that has produced the majority rule is steadily diminishing.

Since the majority of this court has addressed the question, I suggest that there is another reason for not deciding that question in this case. Expert testimony from medical witnesses is not essential in a medical malpractice case when the asserted negligence lies within the comprehension of a jury of laymen. *Pry* v. *Jones,* 253 Ark. 534, 487 S.W. 2d 606. This, in my opinion, is such a case.

Viewed in the light most favorable to appellants, the evidence showed:

> Maggie Long was a very small, elderly, delicate lady who appeared to be in her eighties (she was 86). She was so small that both medications given her could not have been injected in one hip. She was very quiet. She arrived in a wheelchair. She did holler with pain, off and on. A licensed practical nurse who administered the dosage of Demerol prescribed by the doctor thought about the effect the medicine would have on her. Warnings about the use of Demerol on patients with respiratory problems are placed in the package with the medication. Mrs. Long was warned about possible adverse reaction to penicillin but was not warned or told anything at all about Demerol, even though she was mentally alert. Mrs. Long asked Dr. Starnes what he was going to give her. The physician only told the patient he was going to give her something for her pain, but did not say what type of medication it would be. Mrs. Long was reasonable at all times before the Demerol was injected.

> Mrs. Fuller, the daughter of Mrs. Long, had become concerned about her mother around midnight, because of a rising temperature and a dry, hacking

cough which produced pain. She had called the hospital. When she had stated that Mrs. Long had had emphysema and had had pneumonia several times, she was told to bring her mother to the emergency room. Upon arrival at the hospital emergency room at 2:15 a.m., Mrs. Long stated that she had a pain in her left side and a temperature. This information and her respiration and blood pressure readings were noted in the emergency room. Dr. Starnes and Dr. Clopton were noted as admitting physicians of record. The physical history recorded on the hospital records showed: "Initial impression: Acute respiratory infection." Dr. Starnes noted that Mrs. Long had sharp pains in her left anterior chest, tenderness to pressure, and that it hurt for her to take a deep breath. The doctor first recorded the dosage as 50 milligrams of the Demerol and 50 milligrams of Phenegran, but marked out the entry of these dosages and changed them to read 25 milligrams of each.

The package insert which came with the Demerol (meperidine) reads, in part:

> Asthma and other respiratory conditions. Meperidine should be used with extreme caution in patients having an acute asthmatic attack, patients with chronic obstructive pulmonary disease or cor pulmonale, patients having a substantially decreased respiratory reserve, and patients with preexisting respiratory depression, hypoxia, or hypercapnia. In such patients, even usual therapeutic doses of narcotics may decrease respiratory drive while simultaneously increasing airway resistance to the point of apnea.

Dr. Starnes admitted that Demerol is to be used with extreme caution with patients having a substantially decreased respiratory reserve or preexisting respiratory depression. Some of the risks include nausea, vomiting, dizziness, respiratory depression and decreased blood pressure. Dr. Starnes was familiar with other medications that did not have as great an effect on

the respiratory system. The medical history taken when Mrs. Long arrived at the hospital disclosed that she had acute respiratory infection. Dr. Starnes determined that she was ill with pleurisy, which he described as an inflammation or infection of the pleura, the membraneous sacs which surround the lungs. He said that if a person could not withstand the pain resulting from pleurisy, they could not breathe as deeply as at other times. The visual pleura are part of the respiratory system. It was Dr. Starnes' impression that the Demerol caused respiratory depression.

The Physician's Desk Reference, relied upon by physicians as the primary authority on drugs, discloses the following about meperidine, the chemical name for Demerol:

> Meperidine should be given with caution and the initial dose should be reduced in certain patients such as the elderly or debilitated, and those with severe impairment of hepatic or renal function, hypothroidism, Addison's disease and prostatic hypertrophy or urethral stricture.

> The major hazards of meperidine, as with other narcotic analgesics, are respiratory depression and, to a lesser degree, circulatory depression; respiratory arrest, shock, and cardiac arrest have occurred.

Appellants had alleged that Dr. Starnes had been negligent in failing to obtain an informed consent for the use of Demerol, in failing to warn Mrs. Long of the risks known to be associated with Demerol and in failing to heed contra-indications in the patient's condition.

I do not think that a juror with average intelligence would need expert evidence to decide whether there was negligence if the evidence, viewed in the light most favorable to the patient, shows that a doctor, knowing that a weak, debilitated, elderly lady, who had previously had emphysema and pneumonia, was presently suffering from a respiratory

infection, or pleurisy, to the extent that she experienced pain from breathing, answered her inquiry by saying that he was going to give her something for pain, and then administered a medication that he knew involved risks to such a person, without advising her of the risk involved.