James ARONSON, M.D. *v.* Douglas HARRIMAN

94-1218                                                      901 S.W.2d 832

Supreme Court of Arkansas
Opinion delivered July 17, 1995
[Rehearing denied September 11, 1995.]

*Mitchell, Williams, Selig, Gates & Woodyard*, by: *R.T. Beard, III*, for appellant.

*Odom, Elliott, Winburn & Watson*, by: *Bobby Lee Odom, Russell B. Winburn*, and *Conrad T. Odom*, for appellee.

JACK HOLT, JR., Chief Justice. This is a medical malpractice case. The appellee, Douglas Harriman, underwent surgery to correct scoliosis, and was left paralyzed from the chest down following the procedure. He brought suit against the appellant, Dr. James Aronson, the orthopedic surgeon who performed the procedure, and certain named malpractice insurance carriers. The case proceeded to trial against separate defendant Dr. Aronson on the issues of negligent medical care and treatment, and on Dr. Aronson's alleged failure to obtain Mr. Harriman's informed consent to the procedure. The jury considered these issues separately, and returned a verdict in favor of Dr. Aronson on the issue of medical malpractice, but in favor of Mr. Harriman on the issue of informed consent. The trial court entered judgment against Dr. Aronson in the amount of $931,287.53 in accordance with the jury's verdict, from which he now appeals. Mr. Harriman cross-appealed the trial court's order dismissing separate defendant American Insurance Exchange; however, we dismissed Mr. Harriman's cross-appeal, pursuant to his motion to withdraw.

In presenting his appeal, Dr. Aronson raises three points:

(1) that the trial court erred in denying his various motions for directed verdicts, motion in limine, and in submitting the issue of informed consent to the jury; (2) that the issue of informed consent was inappropriate to submit to the jury because Mr. Harriman himself could not state that, if he had been informed that paralysis was a possible complication of the surgery, he would not have undergone the procedure; and (3) that the trial court erred in instructing the jury and submitting an interrogatory to them on the issue of informed consent. We affirm.

## Facts

On September 4, 1991, appellee Douglas Harriman, then eighteen years old, underwent surgery at Arkansas Children's Hospital to correct scoliosis, commonly known as the abnormal curvature of the spine. The surgery, known as a Cotrel-Dubosset ("CD") instrumentation procedure, which involves the implantation of rods into the spinal column, was performed by the appellee, Dr. James Aronson, an orthopedic surgeon. After the CD rods were inserted and during the stage of procedures known as the "wake-up test," in which Mr. Harriman was brought to a level of consciousness in order to determine whether he could move his feet and toes, it was determined that Mr. Harriman could not move his feet at all. The rods were then removed, the incision closed, and Mr. Harriman was taken to a recovery room where several other tests were performed. Most unfortunately, following the surgery, Mr. Harriman was left paralyzed from his chest down.

Mr. Harriman filed a complaint in Pulaski County Circuit Court against Dr. Aronson's malpractice insurance carrier, American Physicians Insurance Exchange ("American"), and St. Paul Fire & Marine Insurance Company ("St. Paul"), the insurance carrier for Arkansas Children's Hospital, alleging medical negligence. Thereafter, Mr. Harriman amended his complaint to include Dr. Aronson as a separate defendant. The trial court granted American's motion to dismiss, St. Paul was non-suited, and the case proceeded to trial against Dr. Aronson on the issues of negligent medical care and treatment, and on Dr. Aronson's alleged failure to obtain Mr. Harriman's informed consent to the procedure.

At trial, Douglas Harriman's mother, Janet Harriman, testi-

fied that a school nurse discovered that her son, a diabetic, had scoliosis. After seeing two other physicians, Mrs. Harriman took Douglas to see Dr. Aronson at Arkansas Children's Hospital, thinking that he would fit Douglas with a brace. According to Mrs. Harriman, Dr. Aronson told them that a brace would not work, as Douglas' body had grown to maturity, and mentioned the possibility of surgery. During a second visit with Dr. Aronson, they further discussed the option of surgery, as well as the Harrimans' concern that Douglas was a diabetic.

During a third visit to the hospital, Douglas underwent an MRI and saw a slide show, which indicated that scoliosis became dangerous when the curvature reached 40 degrees. It was Mrs. Harriman's testimony that Dr. Aronson had told them that the curvature in Douglas' spine was 38 degrees, but that he felt that surgery was necessary. Mrs. Harriman further stated that she and her husband, Harlan Harriman, had discussed the surgery, and that their main concern was the idea of their son being anesthetized under his diabetic condition. Mrs. Harriman could not recall Dr. Aronson telling her that paralysis was a risk; furthermore, she stated that she would have remembered had Dr. Aronson told her of this possibility. According to Mrs. Harriman, when signing the consent form, she asked Dr. Aronson if her son could be disabled, to which he responded, "I have done a number of these operations, and I have never had anything happen yet."

During cross-examination of Mrs. Harriman, Dr. Aronson sought and obtained admission of a notation in a medical chart by Dr. Neal Lenthicum, a resident physician who treated Douglas, in which Dr. Lenthicum indicated that the risks and benefits of surgery had been discussed with Douglas and his parents, that their questions had been answered, that he had seen Douglas with Dr. Aronson, and that the family understood the procedure and would proceed with surgery. Also admitted into evidence during cross-examination of Mrs. Harriman was a consent form signed by Mrs. Harriman and her son, as well as a progress note written by Dr. Aronson indicating that he had discussed the risks of the procedure with the family, including risks of "neurological damage"; however, no specific mention was made of the possibility of paralysis in the medical chart or consent form.

Douglas' father, Harlan Harriman, corroborated much of his

wife's testimony,. adding that they had left the decision up to Douglas as to whether to have the surgery. It was his testimony that Dr. Aronson had stated, in December of 1990, that the procedure was one "that had been done many, many times" and that there was no problem with the surgery. While Mr. Harriman stated that the family did not discuss the possibility of paralysis, and that he had never heard any discussion about the possibility of a disability, he later admitted that, after a nurse said something to his wife, the subject of disability did arise, and that a discussion followed. Here again, no specific mention was made of the potential of paralysis.

Dr. John David Warbritton III, a board-certified orthopedic surgeon with a solo practice in Oakland, California, also testified on behalf of Douglas. He stated that, although he had never seen Douglas personally, he had examined his medical records, from which he determined that, as a result of either the incorrect placement of hooks or excessive instrumentation during the procedure, an interruption of blood to Douglas' spinal cord occurred, causing a spinal stroke and, ultimately, paralysis.

When counsel for Mr. Harriman questioned Dr. Warbritton regarding the standard of care in 1991 for informing patients of complications pertaining to a spinal operation involving instrumentation, Dr. Aronson objected on the grounds that the information elicited had not been provided in discovery, and that Dr. Warbritton was not competent to testify on this issue. The trial court sustained the objection; however, Dr. Warbritton later testified that the opinions he had formulated in Douglas' case were based upon "a national standard of care for all board-certified orthopedic surgeons."

At the conclusion of Dr. Warbritton's testimony, Dr. Aronson, recognizing from pre-trial discovery that Mr. Harriman had no other experts left to be called as witnesses, moved in limine that Douglas be precluded from testifying on the issue of informed consent on the basis that there was no competent evidence in the record to submit a jury question on the issue. The trial court denied the motion.

Douglas Harriman testified regarding the discovery of his scoliosis, stating that he was in quite a lot of pain during his early high school years. While he remembered that Dr. Aronson had

talked with him about the possible infections and his diabetic condition, he stated that he never considered the possibility of paralysis, as Dr. Aronson never mentioned this risk to him prior to the surgery. It was Douglas' testimony that had Dr. Aronson mentioned the chance of paralysis, he "[couldn't] say that [he] wouldn't have had [the surgery], but it would have made the decision a lot harder to decide."

After Mr. Harriman rested, Dr. Aronson moved for directed verdict based on Mr. Harriman's failure to produce testimony, as required by Ark. Code Ann. § 16-114-206(b)(1), to show that the information Dr. Aronson provided Douglas did not comply with that given by other medical care providers with the same training and experience at the time of the surgery in the locality in which Dr. Aronson practiced, or in a similar locality. The trial court denied the motion, and Dr. Aronson made yet another motion for directed verdict based upon Mr. Harriman's alleged failure to state, pursuant to Ark. Code Ann. § 16-114-206 (b)(2)(C), that he would not have had the surgery even had he known of the potential risk of paralysis. The trial court again denied the motion.

Thereafter, Dr. Aronson, a board-certified orthopedic surgeon and a pediatric orthopedic specialist, testified on his own behalf. His credentials in the field on spinal surgery are extensive, which include working with Jean Dubousset in Paris, for whom the CD procedure was named, and with Dr. Harry Shuflebarger, who is widely recognized as the foremost CD spine surgeon in the United States. Dr. Aronson denied telling the Harrimans that it was "mandatory" that Douglas have surgery, stating that he twice explained the risks versus the benefits of surgery to them, as this was the "way he always [did] things." It was Dr. Aronson's testimony that, when he explained to the Harrimans the neurological risks involved in operating in the vicinity of the spinal cord, Mrs. Harriman "stepped back and was taken aback," and asked him if he had ever had that happen, to which he responded in the negative, stating, however, that the risk was one in one thousand. Specifically, Dr. Aronson testified that "neurologic" was a "big term," and stated that he explained this risk to the Harrimans as follows:

Of course, I explain that that means if you injure a

nerve in a hand that means a limited loss of feeling and strength. But if you injure the spinal cord a neurologic problem means paralysis. I discussed that September 3rd in front of all these students with Doug and his family. I discussed it in our second clinic visit well before we scheduled surgery. I would never schedule surgery without discussing that first.

On cross-examination, when asked if he "discuss[ed] all those things with Douglas Harriman including paralysis," Dr. Aronson responded affirmatively, stating, "Of course I did."

Dr. Albert Sanders testified on Dr. Aronson's behalf, stating that he had reviewed the medical records, x-rays, depositions, as well as the testimony of Dr. Warbritton. It was Dr. Sanders' opinion that Dr. Aronson's care and treatment of Douglas was "completely appropriate." He stated on cross examination that paralysis was a risk with the type of procedure in question, and that it was appropriate to inform the patient of that risk.

At the close of Dr. Aronson's case, he renewed his motions for directed verdict, incorporating the same arguments in his previous motion at the close of Mr. Harriman's case, which the trial court denied. Mr. Harriman offered rebuttal testimony, stating that he "remembered no talk ever — ever on the subject even being brought up of paralysis." Dr. Aronson renewed his motions for directed verdict, which the trial court denied. Thereafter, the trial court instructed the jury separately on the issues of negligence and informed consent. The jury returned a verdict in favor of Dr. Aronson on the issue of medical malpractice, but in favor of Mr. Harriman on the issue of informed consent. The trial court entered judgment against Dr. Aronson in the amount of $931,287.53 on the issue of informed consent, from which Dr. Aronson now appeals.

### I. Sufficiency of evidence on informed consent

For his first argument on appeal, Dr. Aronson submits that the trial court erred in denying his various motions for directed verdict, in denying his motion in limine, and in submitting the issue of informed consent to the jury. Particularly, Dr. Aronson asserts that Mr. Harriman failed to present evidence as required by Ark. Code Ann. § 16-114-206(b)(1) (1987), that the infor-

mation provided to him about the anticipated surgery itself, including the recognized risks and benefits of the procedure, failed to conform with that type of information as would customarily have been given to a patient by orthopedic surgeons practicing in Little Rock or a similar locality in order to obtain Mr. Harriman's informed consent to the surgical procedure.

Mr. Harriman concedes in his brief that the trial court refused to allow his expert, Dr. John Warbritton, to testify regarding the standard of care for informed consent; however, he asserts that Dr. Aronson introduced certain evidence into the trial which established that paralysis was a risk of the procedure about which a patient would customarily have been advised by an orthopedic surgeon in Little Rock or a similar locality. Specifically, Mr. Harriman contends that there were four critical pieces of evidence which supported the jury's verdict on informed consent: (1) a notation in the medical chart by Dr. Neal Lenthicum; (2) the consent form; (3) a notation in the medical chart by Dr. Aronson; and (4) the testimony of Dr. Albert Sanders.

■ The framework for considering the issue of informed consent is set out in Act 709 of 1979, codified at Ark. Code Ann. § 16-114-206(b)(1987), which states, in pertinent part, as follows:

> (1) [T]hat type of information regarding the treatment, procedure, or surgery as would customarily have been given to a patient in the position of the injured person . . . by other medical care providers with similar training and experience at the time of the treatment, procedure, or surgery in the locality in which the medical care provider practices or in a similar locality.

See also Arthur v. Zearley, 320 Ark. 273, 895 S.W.2d 928 (1995). Shortly after the legislature passed Act 709, we discussed the physician's duty to warn in Fuller, Adm'x v. Starnes, 268 Ark. 476, 597 S.W.2d 88 (1980), holding that the physician's duty to disclose risks is measured by the customary practice of physicians in the community in which he practices or in a similar community. In so holding, we stated that the disclosure standard "always requires expert medical testimony for the jury to determine whether a physician's failure to disclose constitutes a breach of

his duty to disclose." *Id.* at 479.

Twelve years later, in *Grice* v. *Atkinson*, 308 Ark. 637, 826 S.W.2d 10 (1992), we reaffirmed our position in *Fuller* in upholding the trial court's decision to direct a verdict in favor of a dentist where the patient's expert witness merely stated in a conclusory fashion that the information that the dentist had provided the patient in order to obtain her consent for oral surgery was inadequate. In *Grice*, we held that the expert's testimony lacked the "essential constituent of proof" mandated by Ark. Code Ann. § 16-114-206(b)(1), where there was no attempt to compare the locale of the expert's practice to that of the dentist, there was no testimony regarding the size, character, availability of facilities, or even the location of the expert's practice, and where there was no attempt to compare the similarity of medical/dental facilities, practices and advantages available in the dentist's locality with those existing in comparable localities with which the expert was familiar.

Most recently, we relied on our decision in *Fuller* in *Brumley* v. *Naples*, 320 Ark. 310, 896 S.W.2d 860 (1995), in affirming the trial court's granting of summary judgment in favor of a physician on the issue of informed consent, where, upon the trial court's review of the deposition of the patient's disclosed expert, the expert could not offer testimony as required by § 16-114-206(b).

■■ Our standard of review in determining the propriety of the trial court's refusal to direct a verdict is whether the jury's verdict was supported by substantial evidence, that is, evidence that was sufficient to compel a conclusion one way or the other that goes beyond suspicion or conjecture. *Barnes, Quinn, Flake & Anderson* v. *Rankins*, 312 Ark. 240, 848 S.W.2d 924 (1993). Dr. Aronson made a directed verdict motion at the close of Mr. Harriman's case specifying the same grounds he now argues on appeal; that is, that Mr. Harriman failed to present the requisite expert testimony pursuant to Ark. Code Ann. § 16-114-206(b)(1). While Dr. Aronson's abstract indicates that he merely "renewed [his] motions for directed verdict" at the close of Mr. Harriman's case and at the close of all the evidence, we recently held in *Durham* v. *State*, 320 Ark. 689, 899 S.W.2d 470 (1995), that a criminal defendant is not required to restate his grounds for

directed verdict where he has made a specific motion at the close of the State's case, and incorporates the same arguments by the later renewal. We see no reason not to apply the rule in Durham to civil cases and to this case in particular, as Dr. Aronson made a specific motion at the close of Mr. Harriman's case as required by Ark. R. Civ. P. 50(a), and incorporated the same arguments by the later renewal. As such, we will reach the merits of his arguments.

When reviewing the evidence in a light most favorable to Mr. Harriman, as we are required to do, *See e.g. Quinney* v. *Pittman*, 320 Ark. 177, 895 S.W.2d 538 (1995), we recognize that, had Dr. Aronson stood on his directed verdict motion at the close of Mr. Harriman's case, his argument that there was insufficient expert evidence on the issue of the physician's duty to disclose would be well taken. However, Dr. Aronson waived his objection to the sufficiency of the evidence when he presented his own case. *See Durham* v. *State, supra; Rudd* v. *State*, 308 Ark. 401, 825 S.W.2d 565 (1992). *See also Willson Safety Products* v. *Eschenbrenner*, 302 Ark. 228, 788 S.W.2d 729 (1990).

During the presentation of his case, Dr. Aronson testified on his own behalf, through which he provided the required proof on the physician's duty to disclose. Specifically, Dr. Aronson testified that he saw Douglas during preoperative rounds along with Dr. Elaine Barber, the chief resident, Dr. Neal Lenthicum, a junior resident, a medical student, and his nurse. It was Dr. Aronson's testimony that while obtaining Douglas's consent to surgery, he was instructing the young doctors on this procedure. According to Dr. Aronson, he "always talk[ed] about the following complications, with spine surgery especially," which included bleeding, infection, the effects of anesthesia, neurological injury, the use of hooks and rods in the procedure, the possibility of hardware failure, and the risk of death. Of particular significance was Dr. Aronson's statement that "[w]hen you operate on the spinal cord and do scoliosis surgery, there is no way not to talk about the potential for neurologic injury." Under these circumstances, when considered together with Dr. Albert Sanders's testimony that paralysis is a risk in spinal surgeries about which a patient should be informed, we cannot say that the trial court erred in denying Dr. Aronson's motion for directed verdict made at the close of his case and again at the close of all the evidence.

■ Dr. Albert Sanders, a board-certified orthopedic surgeon practicing in San Antonio, Texas, testified on behalf of Dr. Aronson, stating that, in his opinion, Dr. Aronson's care and treatment of Douglas in September of 1991 was "completely appropriate" and met the appropriate standard of care of pediatric surgeons in Little Rock or in a similar community. However, on cross examination, Dr. Sanders offered the following testimony concerning the risk of paralysis:

> COUNSEL FOR MR. HARRIMAN: You've stated that paralysis is a risk of this type of procedure; is that correct?
>
> WITNESS: That is correct.
>
> COUNSEL FOR MR. HARRIMAN: Is it appropriate to inform a patient of that risk?
>
> WITNESS: It is appropriate.
>
> COUNSEL FOR MR. HARRIMAN: Is it inappropriate or is it a breach of the standard of care not to inform them of that risk?
>
> WITNESS: Paralysis is one of the most devastating complications of scoliosis surgery and patients must be informed of it.
>
> COUNSEL FOR MR. HARRIMAN: And if they are not, is it a breach of the standard of care?
>
> WITNESS: That would be.

When considering Dr. Sanders's testimony that it is a breach of the standard of care to fail to inform a patient of the risk of paralysis, together with Dr. Aronson's own testimony regarding the standard of care, we must conclude that the trial court did not err in denying Dr. Aronson's motion for directed verdict.

## II. Ark. Code Ann. § 16-114-206(b)(2)(C)

For his second argument on appeal, Dr. Aronson claims that the trial court erred in failing to grant his motion for directed verdict on the grounds that Mr. Harriman failed to comply with the statutory language of Ark. Code Ann. § 16-114-206(b)(2)(C), as Mr. Harriman could not state that he would not have had the

surgery even if he had been informed of the risk of paralysis. Stating his argument another way, Dr. Aronson submits that Mr. Harriman failed to meet his burden of proving that Dr. Aronson's negligence in failing to inform him of the potential of paralysis was a proximate cause of his injuries. During his case in chief, Mr. Harriman testified as follows:

> COUNSEL FOR MR. HARRIMAN: If Dr. Aronson had mentioned to you that there was included in the risks the chance of paralysis, what effect would that have had on your decision to have the surgery?

> > COUNSEL FOR DR. ARONSON: Objection, Your Honor.

> > THE COURT: Objection be denied.

> WITNESS: I wouldn't — I couldn't say that I wouldn't have, but it would have made the decision — I can't say that I still wouldn't have had it. I may still have had it, but it would have made the decision a lot harder to decide, I'm sure.

> COUNSEL FOR MR. HARRIMAN: Did you consider it at all?

> WITNESS: No.

> COUNSEL FOR MR. HARRIMAN: When, if anytime, was it mentioned to you by Dr. Aronson prior to surgery?

> WITNESS: It never was.

Arkansas Code Annotated § 16-114-206(b)(2) (1987) states as follows:

> (2) In determining whether the plaintiff has satisfied the requirements of subdivision (b)(1) of this section, the following matters shall also be considered as material issues:

> . . . .

> > (C) Whether the injured party would have undergone the treatment, procedure, or surgery regardless of the risk involved or whether he did not wish to be informed thereof.

When looking to the plain language of this subsection, we agree with Mr. Harriman's assertion that it merely states that whether the injured party would have undergone the procedure regardless of the risk involved is a material issue, rather than a required constituent of proof. Thus, we must address Dr. Aronson's argument that Mr. Harriman did not prove that Dr. Aronson's failure to inform him of the risk of paralysis was a proximate cause of his damages.

■ In support of his argument that Mr. Harriman failed to prove the required element of causation, Dr. Aronson asserts that the following passage from a Hofstra Law Review article is directly probative of this issue:

> But suppose the plaintiff, despite an awareness of his litigation posture, is so uncertain of how he would have reacted to an adequate disclosure that he can say no more than, "I don't know." Should his case be deemed legally sufficient? I think not, for a few reasons. First, such an unenlightening answer indicates that the plaintiff is unable to assert even that his right of self-determination was violated. Since the essence of the cause of action is a frustration of the plaintiff's right to self-determination, the inability to assert even a probable violation seems to destroy the crux of the action. Since the one person in the world who should best know how he would have reacted to an adequate disclosure has given an unenlightening response, permitting the jury to consider the issue would be an exercise in undue speculation. Rejecting the "I don't know" response does not unduly impose an "honest" plaintiff; rather, it bases the distinction between a case which is legally sufficient and one which is not on the presence or absence of critical testimony from the "world's foremost authority" on the subject.

David E. Seidelson, *Lack of Informed Consent in Medical Malpractice*, 14 Hofstra L. Rev. 621 (1986). Even so, we cannot agree with Dr. Aronson's position that Mr. Harriman's failure to state that he absolutely would not have undergone the procedure had he been informed of the risk of paralysis should have precluded the jury from being allowed to reach the issue of informed consent. Instead, we adopt an objective standard for determining

the effect of complete information on Mr. Harriman's decision. Under an objective standard, causation is evaluated in terms of whether a reasonable and prudent patient in Mr. Harriman's position would have withheld consent to the treatment or procedure had the material risks been disclosed. *Pegalis & Wachsman, American Law of Medical Malpractice 2d*, § 4:1, pp. 200-201 (Clark Boardman Callaghan 1992). In adopting the objective standard, the Maryland Court of Appeals stated that:

> [I]f a subjective standard were applied, the testimony of the plaintiff as to what he would have hypothetically done would be the controlling consideration. Thus, proof of causation under a subjective standard would ultimately turn on the credibility of the hindsight of a person seeking recovery after he had experienced a most undesirable result. Such a test puts the physician in "jeopardy of the patient's hindsight and bitterness."

*Sard* v. *Hardy*, 379 A.2d 1014, 1025 (Md. 1977) (internal citations omitted.) The objective approach we take permits the jury to take into account Mr. Harriman's testimony with regard to whether he would have consented to such risks but would not predicate the outcome of the case solely on that testimony.

Our adoption of an objective standard is consistent with Ark. Code Ann. § 16-114-206(b)(2) (1987), which states that testimony of the injured party about what he would have done regardless of the risk is only one factor to be considered material to the determination, rather than dispositive. By adopting this standard, we are in line with a majority of cases which have wrestled with this issue. *See* Prosser & Keeton on Torts § 32, p. 191 (5th ed. 1984); *see also Speiser, Krause, Gans, The American Law of Torts*, § 15:73, p. 658 (Lawyers Co-operative Publishing Co. 1987).

In applying this objective standard to the facts at hand, we do not agree that the jury should have been precluded from being allowed to reach the issue of informed consent; as the jury was able to consider Mr. Harriman's testimony that he was unsure whether he would have undergone the procedure had he known of the risk of paralysis, along with other factors such as whether a patient of ordinary intelligence and awareness in Mr. Harriman's position could reasonably be expected to know of

the risks involved in the procedure, and whether Mr. Harriman actually knew of the risks of the procedure. *See* Ark. Code Ann. § 16-114-206(b)(2)(A) and (B). Thus, the jury was free to conclude that, with the information that paralysis was in fact a risk, a reasonable prudent patient would not have consented to having the surgery. As there was conflicting testimony as to whether Dr. Aronson informed Mr. Harriman of the risk of paralysis, it was within the province of the jury to weigh the credibility of the witnesses. *See Quinney* v. *Pittman*, supra. The jury found, by a preponderance of the evidence, that Dr. Aronson failed to supply to Mr. Harriman that type of information regarding the treatment and surgery as would have been customarily given to a patient in Mr. Harriman's position by other medical providers with similar training and experience at the time of the treatment and surgery in Little Rock or in a similar locality. Under these circumstances, we conclude that Dr. Aronson's failure to so advise Mr. Harriman was a proximate cause of Mr. Harriman's damages, and, thus, Dr. Aronson's argument on this point is without merit.

### III. Informed consent instruction

Dr. Aronson's final point on appeal is that the trial court erred in instructing the jury on the issue of informed consent. Specifically, Dr. Aronson objected to jury instruction numbers five, six, and nine, arguing that there was a "lack of sufficient competent evidence" to submit the issue of informed consent to the jury. Jury instruction number five was given as follows:

> Douglas Harriman claims damages from James Aronson, M.D. and has the burden of proving each of these essential propositions: First, that he has sustained damages; second, that James Aronson, M.D. was negligent or that James Aronson, M.D. failed to give sufficient information to Douglas Harriman to obtain an informed consent.

Dr. Aronson objected to jury instruction number five, which was a modification of Arkansas Model Instruction: Civil 3d 203, as the issue of informed consent was added to this instruction. The trial court overruled Dr. Aronson's objection.

Also at issue is jury instruction number six, which reads as follows:

You'll be given three written interrogatories [sic]. These interrogatories present the issues of fact which you must decide.

Second, do you find from a preponderance of the evidence that Dr. James Aronson failed to supply to Douglas Harriman that type of information regarding the treatment and surgery as would customarily have been given a patient in the position of Douglas Harriman by other medical care providers with similar training and experience at the time of the treatment and surgery in this locality or a similar locality?

Dr. Aronson objected to the submission of jury instruction number six on the basis that there was a lack of sufficient competent evidence in the record to submit the issue of informed consent to the jury. The trial court again overruled Dr. Aronson's objection. Finally, jury instruction number nine was read to the jury, which states that:

Prior to plaintiff's surgery the physician has a duty to supply to Douglas Harriman that type of information regarding the treatment and surgery as would have been given to a patient in the position of Douglas Harriman by other medical care providers with similar training and experience at the time of the treatment and surgery in the locality in which the medical care provider practices, or in a similar location. A failure to meet this standard is negligence.

In determining whether a physician satisfied his duty to provide information regarding the treatment and procedure, you may consider the following matters: (A) Whether a person of ordinary intelligence and awareness in a position similar to that of Douglas Harriman could reasonably be expected to know of the risk or hazards inherent in such treatment or surgery — and surgery. (B) Whether Douglas Harriman knew of the risk or hazard inherent in such treatment or surgery. (C) Whether Douglas Harriman would have undergone the treatment and surgery regardless of the risk involved, or whether Douglas Harriman did not wish to be informed thereof, and (D) Whether it was reasonable for the physician to limit disclosure of information because

such disclosure could be expected to adversely and substantially affect Douglas Harriman's condition.

It is true that jury instructions stating abstract legal propositions without any evidentiary basis should not be given. *Davis* v. *Davis*, 313 Ark. 549, 856 S.W.2d 284 (1993). As we stated earlier, there was sufficient evidence to submit the issue of informed consent to the jury; likewise, there was a sufficient evidentiary basis which supported the trial court's decision to give the related instructions on this issue.

Affirmed.