Lewis EADY *v.* Bryan K. LANSFORD

02-695 92 S.W.3d 57

Supreme Court of Arkansas
Opinion delivered December 12, 2002

252

*Law Offices of Charles Karr, P.A.*, by: *Charles Karr* and *Shane Roughley*, for appellant.

*Warner, Smith & Harris, PLC*, by: *Waynr Harris*, for appellee.

TOM GLAZE, Justice. In this case, Lewis Eady challenges the constitutionality of the Arkansas Medical Malpractice Act, codified at Ark. Code Ann. §§ 16-114-201, *et seq.* (1987 and Supp. 2001), with respect to cases involving informed consent. The trial court rejected Eady's argument. Specifically, Eady argues that Ark. Code Ann. § 16-114-206(b) (1987 and Supp. 2001) is invalid as special legislation under Ark. Const. amend. 14, and violates his equal protection rights under U.S. Const. amend. 14 and Ark. Const. art. 2, § 3. Alternatively, if § 16-114-206(b) is constitutional, Eady submits that our court should apply the "common knowledge" exception to informed consent cases.

The facts leading to this controversy can be briefly stated. Eady saw Dr. Bryan Lansford about complaints Eady had of seasonal allergy symptoms, nasal congestion, and facial pain. Dr. Lansford diagnosed Eady as having allergic rhinitis and possible sinusitis. The doctor ordered an allergy evaluation, a CT scan of Eady's sinuses, and nasal steroids, and he gave Eady a prescription for Bactrim and asked him to return in two weeks. Upon Eady's return, the doctor noted that Eady suffered from allergies and suggested Eady might want to consider endoscopic sinus surgery.

Eady continued to feel bad, and, because he could not get in to see Dr. Lansford right away, Eady went to a medical clinic where he was examined, prescribed an antibiotic, and given an analgesic. Two days later, the clinic also gave Eady a prescription for Lorabid and Darvocet for pain. Later that same day, Eady went to the hospital because he could not eat or drink anything, and he began to spit up blood. At the hospital, Eady was diag-

nosed with Stevens-Johnson Syndrome, an allergic reaction to the Bactrim prescribed by Dr. Lansford. Eady's skin began to peel, he lost his vision, and suffered from other symptoms, including the sloughing of the lining of his esophagus and stomach. He remained in the hospital for twenty-five days and suffered numerous residual effects, including impaired vision and darkened skin.

Eady filed suit against Dr. Lansford, alleging the doctor committed medical malpractice and had been negligent, among other things, by failing to warn Eady of the possible side effects of Bactrim, including Stevens-Johnson Syndrome. He also alleged the doctor failed to obtain Eady's informed consent before prescribing Bactrim. Dr. Lansford responded by moving for summary judgment, attaching an affidavit by Dr. Ehab Hanna, an expert in otolaryngology; Dr. Hanna opined that Lansford's treatment did not fall below the standard of care for an ENT (ear, nose, and throat) specialist in Fort Smith. Eady responded by submitting that § 16-14-206(b) is unconstitutional as special legislation and as violative of the equal protection clause; he further contended summary judgment was inappropriate because there were genuine factual issues to be decided by a jury. Eady did not submit any medical expert affidavit or testimony to counter that furnished by Dr. Hanna.

The trial court rejected Eady's constitutional arguments, stating that Arkansas law is well-settled that expert witnesses are required if the alleged medical negligence is outside a jury's comprehension and not a matter of "common knowledge." Thus, because Eady did not respond to Dr. Lansford's summary judgment motion with any expert testimony of his own, the trial court ruled that Dr. Lansford was entitled to summary judgment.

On appeal, Eady contends that § 16-114-206(b) is out of step with modern medical practices. With respect to cases where a patient's informed consent is at issue, that statute provides as follows:

> (b)(1) Without limiting the applicability of subsection (a) of this section, where the plaintiff claims that a medical care provider failed to supply adequate information to obtain the

informed consent of the injured person, the plaintiff shall have the burden of proving that the treatment, procedure, or surgery was performed in other than an emergency situation and that the medical care provider did not supply that type of information regarding the treatment, procedure, or surgery as would customarily have been given to a patient in the position of the injured person or other persons authorized to give consent for such a patient by other medical care providers with similar training and experience at the time of the treatment, procedure, or surgery in the locality in which the medical care provider practices or in a similar locality.

(2) In determining whether the plaintiff has satisfied the requirements of subdivision (b)(1) of this section, the following matters shall also be considered as material issues:

(A) Whether a person of ordinary intelligence and awareness in a position similar to that of the injured person or persons giving consent on his behalf could reasonably be expected to know of the risks or hazards inherent in such treatment, procedure, or surgery;

(B) Whether the injured party or the person giving consent on his behalf knew of the risks or hazard inherent in such treatment, procedure, or surgery;

(C) Whether the injured party would have undergone the treatment, procedure, or surgery regardless of the risk involved or whether he did not wish to be informed thereof;

(D) Whether it was reasonable for the medical care provider to limit disclosure of information because such disclosure could be expected to adversely and substantially affect the injured person's condition.

§ 16-114-206(b).

 As is readily seen by reading § 16-114-206, the burden is on the plaintiff to prove that the physician failed to supply the type of adequate information regarding the treatment or procedures as would have been given by physicians in the same, or in a similar, locality. In *Fuller v. Starnes*, 268 Ark. 476, 597 S.W.2d 88 (1980), this court discussed in some depth the divergent views of American courts concerning the degree of disclosure necessary to render a consent adequate and informed so as to bind the patient:

Although the existence of a physician's duty to warn a patient of hazards of future medical treatment is generally recognized, a wide divergence of views has developed concerning the appropriate standard for measuring the scope of the duty. The minority view is that the duty of a physician to disclose is measured by the patient's need for information material to the patient's right to decide whether to accept or reject the proposed medical treatment. Emphasizing the right of the patient to control what happens to his body, the minority view is undergirded by the proposition that what a patient should be told about future medical treatment is primarily a human judgment. *The majority view is that the duty of a physician to disclose is measured by the customary disclosure practices of physicians in the community or in a similar community. This view emphasizes the interest of the medical profession to be relatively free from vexatious and costly litigation and holds that what a patient should be told about future medical treatment is primarily a medical decision.*

*Fuller*, 268 Ark. at 478 (citations omitted) (emphasis added). *See also Grice v. Atkinson*, 308 Ark. 637, 826 S.W.2d 810 (1992) (where court continued to adhere to the *Fuller* case, stating that this court chose the majority view, which places on the plaintiff the burden of proving that the physician failed to supply the type of adequate information regarding the surgery as would have been given by other physicians in the same, or in a similar, locality); *Aronson v. Harriman*, 321 Ark. 359, 901 S.W.2d 832 (1995); *Brumley v. Naples*, 320 Ark. 310, 896 S.W.2d 860 (1995).

Eady cites to and quotes from a New Jersey Supreme Court decision, *Perez v. Wyeth Lab., Inc.*, 734 A.2d 1245, 1246-47 (N.J. 1999), which contains broad policy language that seems to justify medical product cases directly against drug manufacturers, but Eady fails to clarify how such a policy suggests the obsolescence or unconstitutionality of § 16-114-206(b). In fact, Eady's argument explicitly recognizes that Arkansas "still clings to" the majority view established in *Fuller*.

While our court and the Arkansas General Assembly have adopted the majority view that the duty of a physician to disclose is measured by the customary practices of physicians in the com-

munity or in a similar community, Eady still maintains that it is unconstitutional for § 16-114-206(b) to require a medical expert in every case involving informed consent and that it grants a privilege to health care providers that is not granted to other professionals; he argues that there is no rational basis for drawing a distinction between informed consent cases and other medical malpractice cases.

■ Of course, there is a presumption of validity attending every consideration of a statute's constitutionality; every act carries a strong presumption of constitutionality, and before an act will be held unconstitutional, the incompatibility between it and the constitution must be clear. *Gay v. Rabon*, 280 Ark. 5, 652 S.W.2d 836 (1983). Any doubt as to the constitutionality of a statute must be resolved in favor of its constitutionality. *Id.* The heavy burden of demonstrating the unconstitutionality of a statute is upon the one attacking it. *Id.*

■ Here, in order to prove that the requirement of expert testimony in informed consent cases violates the equal protection clause, Eady would have to demonstrate that there is no rational basis for such a requirement. *See Raley v. Wagner*, 346 Ark. 234, 57 S.W.3d 683 (2001) (finding rational basis for two-year statute of limitations in medical malpractice cases). Under the rational basis test, legislation is presumed constitutional and rationally related to achieving any legitimate governmental objective under any reasonably conceivable fact situation. *Fayetteville Sch. Dist. v. Arkansas State Bd. of Educ.*, 313 Ark. 1, 852 S.W.2d 122 (1993). This presumption places the burden of proof on the party challenging the legislation to prove its unconstitutionality. *Id.*

■ ■ The test is the same for cases in which it is alleged that a statute is unconstitutional special legislation. *Id.* Legislation is special "if by some inherent limitation or classification it *arbitrarily* separates some person, place, or thing from those upon which, but for such separation, it would operate[.]" *Id.* (citing *Owen v. Dalton*, 296 Ark. 351, 757 S.W.2d 921 (1988) (emphasis supplied in text). The determinative factor is whether the General Assembly acted in an arbitrary manner to separate one class of persons

from another, and we apply the rational basis test to determine whether such a separation is arbitrary. *Id.* (citing *Streight v. Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983)).

Eady has offered no proof that the General Assembly acted arbitrarily, or that the legislation is *not* rationally related to achieving any legitimate objective of the government under any reasonably conceivable fact situation, beyond a bare assertion that "the statute's goals of reducing medical costs and malpractice premiums would not be achieved through the imposition of the professional standard with regard to informed consent cases." Clearly, there is a rational relationship between the burden of proof required and the achievement of a legitimate governmental objective. The emergency clause of the Medical Malpractice Act states as follows:

> It is hereby found, determined and declared by the General Assembly that the threat of legal actions for medical injury have resulted in increased rates for malpractice insurance which in turn causes and contributes to an increase in health care costs placing a heavy burden on those who can least afford such increases and that the threat of such actions contributes to expensive medical procedures to be performed by physicians and others which otherwise would not be considered necessary[,] and that this Act should be given effect immediately to help control the spiraling cost of health care.

It is made clear by the General Assembly that the objective of the Act is to control rapidly increasing health care costs. The requirement of producing expert testimony in informed consent cases assists in keeping such costs down; in the absence of such a requirement, nearly every informed consent claim would create a jury question as to whether the "prudent patient" standard (i.e., the minority standard) had been met. This would result in more litigation, higher costs, and greater expenses to the medical profession, which would in turn be passed on to patients and health care consumers. Thus, the General Assembly did not act arbitrarily in requiring a different degree of proof in informed consent cases than in other medical malpractice cases.

■ ■ Finally, Eady argues that, in the event the court determines that the act is constitutional, we should alternatively apply the "common knowledge" exception to informed consent cases. This exception provides that expert medical testimony is not required when the asserted negligence lies within the comprehension of a jury of laymen, such as a surgeon's failure to sterilize his instruments or to remove a sponge from the incision before closing it. *See Haase v. Starnes*, 323 Ark. 263, 915 S.W.2d 675 (1996) (citing *Lanier v. Trammel*, 207 Ark. 372, 180 S.W.2d 818 (1944)). On the other hand, when the applicable standard of care is not a matter of common knowledge, the jury must have the assistance of expert witnesses in coming to a conclusion upon the issue of negligence. *Id.*

Eady argues that this "common knowledge" exception should apply "because a prudent patient would want to know about serious risks of death or severe injury from a treatment." Here, the asserted negligence was Dr. Lansford's alleged failure to inform Eady of the potential for developing Stevens–Johnson syndrome. The question is whether this asserted negligence lies within the comprehension of a jury of laymen. Eady asserts that it does, because the jury could understand that a reasonably prudent patient in his position would have opted for a different treatment, had he been informed of the possibility of suffering this serious complication, and he argues that the "common knowledge" exception should apply to informed consent cases, because "a lay jury can understand that a physician has a duty to disclose potential side effects which may cause death or a significant risk of death."

■ However, such argument simply ignores the requirement in § 16-114-206(b) that an informed–consent plaintiff must demonstrate "that the medical care provider did not supply the type of information . . . as would customarily have been given to a patient in the position of the injured person . . . by other medical care providers with similar training and experience at the time of the treatment . . . in the locality in which the medical care provider practices or in a similar locality." To accept Eady's argument

would require holding § 16-114-206(b) unconstitutional. One cannot "alternatively" apply the common knowledge exception to informed consent cases without striking § 16-114-206(b) in its entirety. As discussed above, we hold the statute is constitutional, and therefore, the court will not "alternatively" apply the common knowledge doctrine.

In sum, Dr. Lansford presented expert testimony to the effect that he was acting within the required standard of care of physicians engaged in the practice of otolaryngology during 1996 within the State of Arkansas. Dr. Lansford's expert stated that the prescribing of Bactrim was appropriate for the treatment of Eady's symptoms, and that, although a physician does have a duty to inform a patient about commonly encountered side effects, the risk of developing Stevens-Johnson syndrome is so rare that doctors do not specifically advise of that risk unless a patient has a known allergy to sulfonamides such as Bactrim. Further, Dr. Lansford's expert pointed out that Eady's condition was about the same on September 25, 1996, as it had been on September 13, 1996, and there was no reason presented to Dr. Lansford to have discontinued Eady's taking of Bactrim at that time.

Rather than meeting proof with proof, and offering expert testimony of his own, Eady chose to challenge the constitutionality of the statute. The proof required to survive a motion for summary judgment in a medical malpractice case must be in the form of expert testimony. *Ford v. St. Paul Fire & Marine Ins. Co.*, 339 Ark. 434, 55 S.W.3d 460 (1999) (citing *Oglesby v. Baptist Medical System*, 319 Ark. 280, 891 S.W.2d 48 (1995)). Eady offered no proof whatsoever to demonstrate that Dr. Lansford violated the appropriate standard of care. Because Eady failed to meet proof with proof in the form of expert testimony, the trial court did not err in granting Dr. Lansford's motion for summary judgment, and the lower court's decision is therefore affirmed.