R. Don CAPLENER and Kathy Caplener *v.* BLUEBONNET
MILLING COMPANY; Fry's Reproductive Center; and
English Lawn Garden and Feed

95-221                                     911 S.W.2d 586

Supreme Court of Arkansas
Opinion delivered December 18, 1995

752

*The Samuel A. Perroni Law Firm, P.A.*, by: *Samuel A. Perroni*, for appellants.

*Trammell Law Firm*, by: *Thomas F. Meeks*, for appellee Bluebonnet Milling Co.

*Margaret Meads, P.A.*, by: *Margaret Meads*, for appellee English Lawn Garden & Feed.

DAVID NEWBERN, Justice. In the summer of 1993, 23 young ostriches belonging to the appellants, Don and Kathy Caplener,

died. The Capleners sued Bluebonnet Milling Company (Bluebonnet) which manufactured the feed they had fed the ostriches. They also sued the feed wholesaler, Fry's Reproductive Center (Fry's), and the retailer, English Lawn, Garden & Feed (English). The Trial Court entered summary judgment in favor of the defendants. The Capleners contend summary judgment was inappropriate as a genuine issue of material fact remained whether defective feed caused the deaths of the Ostriches. We affirm due to the failure to produce evidence that the feed caused the ostriches to die. We also affirm on cross-appeal the Trial Court's refusal to award attorney's fees to the prevailing parties and his denial of English's request for indemnification for litigation expenses from Bluebonnet.

Mr. Caplener's deposition testimony was that his ostriches, which ranged in age from one month to four months, were being fed Bluebonnet Chick Starter. Between May 28, 1993, and June 9, 1993, four bags of the feed were purchased from English and used. On June 16, 1993, some of the ostriches began to show symptoms of illness.

Dr. James W. Mills, a veterinarian, executed an affidavit on September 9, 1993. He said he was called to treat the birds. He initially prescribed antibiotics and electrolytes and then flushing with water. The birds did not respond to the treatment. Dr. Mills then recommended changing to a different brand of feed. None of the treatments succeeded. From postmortem operations Dr. Mills discovered the feed had impacted in the birds' stomachs and that caused their deaths. He stated, "blood tests . . . showed normal cultures . . . and no bacteria or infection present which could have caused death."

The Capleners had a laboratory analysis performed on a sample of the feed which had been left in a feed pan after most of the Bluebonnet feed had been removed. The results from the first sample sent to the laboratory were negative, but a second sample contained four parts per billion of aflatoxin. It is undisputed that aflatoxin, in concentrated amounts, can be lethal to ostriches. According to Mr. Caplener's deposition, lettuce or boiled eggs had been sprinkled on the Bluebonnet feed occasionally to encourage the birds to eat.

The complaint alleged the feed was adulterated due to the

presence of aflatoxin. It was amended to add the allegation of failure to warn and, after the motion for summary judgment was filed, it was amended to allege liability based on the feed being indigestible.

In a deposition, Dr. Mills contradicted his earlier affidavit. He admitted that both *e. coli* and *klebsiella* pathogens were found in the intestines of the ostriches, and that death by bacterial pathogen could not be ruled out. His deposition testimony was also internally contradictory. At one point, Dr. Mills opined that the birds died from feed impaction, but in another part of his deposition, he stated he could not give a definite opinion as to why the birds died. Finally, when questioned on the quality of the feed, the following colloquy occurred:

> MR. MEEKS [counsel for Bluebonnet]: What caused the impaction?
>
> DR. MILLS: I don't know the answer to that.
>
> * * *
>
> MR. MEEKS: Okay. Well, I guess what I'm asking: Are you going to testify at trial that there was something wrong with the food and that caused them to impact?
>
> DR. MILLS: No, because I don't know that there was anything wrong with the food.
>
> MR. MEEKS: Okay.
>
> DR. MILLS: And I can't stand up and say that the food was bad. No, I can't do that.

On August 15, 1994, Fry's and English filed a joint motion for summary judgment. Bluebonnet moved for summary judgment on the same day. Both motions were based on the Capleners' failure to produce evidence that the feed proximately caused the deaths of the birds. Attached to Bluebonnet's motion were excerpts from the depositions of Dr. Mills and Richard Plant, a chemist who had examined some of the leftover feed and found low levels of aflatoxin. Mr. Plant said he was not an expert on the effects of aflatoxin on ratites and that he did not know how much aflatoxin it would take to kill an ostrich. He stated that his opinion was based simply on the fact that toxins are known to

vary widely in their concentration within a batch of feed. He also stated that he was not going to testify that aflatoxin killed the birds. Also attached were affidavits from Dr. John Reagor, the head of the Texas Diagnostic Toxicology Department, and Dr. Karen Hicks-Alldredge, a veterinary expert on the care of ratites. Both concluded, based on the deposition testimony in the record, that the birds did not die from aflatoxin poisoning.

With their response to the motion for summary judgment the Capleners filed a second affidavit of Dr. Mills, dated August 17, 1994, in which he stated, in contrast to his deposition testimony, "I believe that there was something wrong with the commercial feed that prevented it from digesting properly. As I testified, I did not test the feed and could not say in what way the feed was defective."

The Trial Court granted a motion by Bluebonnet to strike Dr. Mills's second affidavit and granted the defendants' motions for summary judgment. The Capleners moved for reconsideration. Attached to the motion, in addition to Dr. Mills's two affidavits and excerpts from his deposition testimony, were several customer complaint forms which showed that other ostrich farmers had complained of molded feed. The Trial Court denied the motion for reconsideration.

The Trial Court also refused to award attorney's fees and refused to order Bluebonnet to indemnify English and Fry's for the cost of the litigation. The Capleners appeal from the summary judgment. Bluebonnet and English appeal from the denial of attorney's fees, and English appeals from the denial of indemnification.

### 1. Material fact issue

When summary judgment is sought, the Trial Court must decide if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ark. R. Civ. P. 56(c); *Oglesby* v. *Baptist Medical System*, 319 Ark. 280, 891 S.W.2d 48 (1995); *Forrest City Mach. Works* v. *Mossbacher*, 312 Ark. 578, 851 S.W.2d 443 (1993).

Among the attachments to Bluebonnet's summary judgment

motion were excerpts from Dr. Mills's deposition testimony as well as testimony of the toxicology expert who said the post-mortem evidence did not indicate the ostriches died from afla-toxins. Also included was testimony of the ratite expert who concluded there was insufficient information to identify the specific cause of death of the ostriches.

Once the movant makes a prima facie showing of entitlement to summary judgment, the respondent must meet proof with proof to demonstrate a remaining genuine issue of material fact. *Sanders* v. *Banks*, 309 Ark. 375, 830 S.W.2d 861 (1992). When a party cannot present proof on an essential element of the claim, the moving party is entitled to judgment as a matter of law. *Id.*

In response to the motion for summary judgment, the Capleners were required to produce some evidence which would raise a material question of fact as to whether the feed manufactured by Bluebonnet caused the impaction. They submit that the second affidavit of Dr. Mills, in which he stated the feed was "indigestible," was sufficient to create a fact issue as to whether the feed caused the birds to die. We hold that the Trial Court correctly excluded the second affidavit when considering the motions for summary judgment.

Our summary judgment rule, Ark. R. Civ. P. 56, is virtually the same as F.R.C.P. 56. The General Assembly adopted the Federal Rule 56 initially by Act 123 of 1961, and we continued to follow the federal model upon adoption of the Arkansas Rules of Civil Procedure which became effective in 1979. As we do with others of our rules modeled on the federal rules, we refer to federal court decisions in our interpretation of Rule 56. *Irvin* v. *Jones*, 310 Ark. 114, 832 S.W.2d 837 (1992); *Short* v. *Little Rock Dodge*, 297 Ark. 194, 795 S.W.2d 104 (1988).

While we have not addressed the issue, federal courts have held that an affidavit which is inherently and blatantly inconsistent with prior deposition testimony may not be used to establish a question of fact to ward off the granting of a summary judgment motion. *Camfield Tires, Inc.* v. *Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir. 1983); *Radobenko* v. *Automated Equip. Corp.*, 520 F.2d 540 (9th Cir. 1975); *Perma Research & Dev. Co.* v. *Singer Co.*, 410 F.2d 572 (2d Cir. 1969); *Vanlandingham* v.

*Ford Motor Co.*, 99 F.R.D. 1 (N.D. Ga. 1993). *See also Jacobs* v. *Fire Ins. Exch.*, 42 Cal.Reptr.2d 906 (Cal.App. 3 Dist. 1995). These cases indicate that a subsequent affidavit may perhaps be used to explain internally inconsistent deposition testimony, *see Kennett-Murray Corp.* v. *Bone*, 622 F.2d 887 (5th Cir. 1980); however, as the Court said in the *Perma Research* case, "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."

Although Dr. Mills's deposition testimony was not a model of clarity, he stated definitely that he did not know what had caused the Capleners' ostriches to die and did not plan to testify on the subject. In his later affidavit he said the birds died because there was something wrong with their feed which caused it to impact. The contradiction is direct, and we hold it was not error for the Trial Court to disregard Dr. Mills's second affidavit.

In addition to Dr. Mills's affidavits, the Capleners presented other evidence in their motion for reconsideration that Bluebonnet and its distributors had received other complaints about feed having mold, being in "clumps," and being discolored. Even if that evidence were to be appropriate for consideration at the late date it was presented, it was insufficient to raise an issue of fact whether the feed eaten by the Capleners' ostriches cause their deaths.

### 2. The evidence standard

The Capleners also argue the Trial Court used the wrong standard in determining whether to grant the motion for summary judgment. The contention is based on the Trial Court's letter ruling in which he wrote, "There is no substantial evidence why [the ostriches] died. There is no substantial evidence the feed was defective or that it caused the deaths." In responding to the Capleners' motion for reconsideration, the Trial Court did not use the term "substantial evidence," but it did appear in the order granting summary judgment.

Generally, a trial court looks for substantial evidence when determining whether to grant a motion for a directed ver-

dict. *See Mahan v. Hall*, 320 Ark. 473, 897 S.W.2d 571 (1995); *See also Jackson v. State*, 290 Ark. 375, 720 S.W.2d 282 (1986). We have, however, said that if the defendant conclusively shows that some fact essential to the plaintiff's cause of action is wanting and the plaintiff is unable to offer substantial evidence to the contrary, a summary judgment is proper. *See Tillotson v. Farmers Ins. Co.*, 276 Ark. 450,637 S.W.2d 541 (1982); *Lee v. Doe*, 274 Ark. 457, 626 S.W.2d 353 (1981); *Akridge v. Park Bowling Ctr.*, Inc., 240 Ark. 538, 401 S.W.2d 204 (1966). Our use of the term "substantial evidence" in opinions describing the evidence which must be produced in response to a motion for summary judgment was ill advised. Substantial evidence is that which is sufficient to compel a conclusion one way or the other and which induces the fact finder to go beyond mere suspicion or conjecture. *Aronson v. Harriman*, 321 Ark. 359, 901 S.W.2d 832 (1995); *Barnes, Quinn, Flake & Anderson, Inc. v. Rankins*, 312 Ark. 240, 848 S.W.2d 924 (1993).

■ As discussed above, the standard to be applied in summary judgment cases is whether there is evidence sufficient to raise a fact issue rather than evidence sufficient to compel a conclusion on the part of the fact finder. Although it was wrong for the Trial Court to have used the term "substantial evidence," some of our prior cases notwithstanding, the error was not prejudicial. As noted in the first segment of this opinion, the Capleners were unable to present evidence to show that a defect in the ostrich feed supplied by the defendants was the cause of the birds' deaths; thus no genuine issue of material fact remained to be decided. We do not presume that prejudice has resulted from a trial court's error, and we will not reverse for error unless prejudice is demonstrated. *People's Bank & Trust Co. v. Wallace*, 290 Ark. 589, 721 S.W.2d 659 (1986). *See also Mikel v. Hubbard*, 317 Ark. 125, 876 S.W.2d 558 (1994); *Carton v. Missouri Pac. R.R.*, 315 Ark. 5, 865 S.W.2d 635 (1993); *Webb v. Thomas*, 310 Ark. 553, 837 S.W.2d 875 (1992).

### 3. Attorney's fees

Bluebonnet and English argue that the Trial Court should have awarded attorney's fees based on Ark. Code Ann. § 16-22-308 and pursuant to Ark. R. Civ. P. 11. The statute provides:

In any civil action to recover on an open account, state-

ment of account, account stated, promissory note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney fee to be assessed by the court and collected as costs.

■ The award of attorney's fees is discretionary under the statute. *Little Rock Wastewater Util.* v. *Larry Moyer Trucking*, 321 Ark. 303, 902 S.W.2d 760 (1995). Neither party cites authority or presents argument indicating that the Trial Court abused his discretion. Absent such authority or argument, we find no abuse of discretion in denying attorney's fees pursuant to the statute.

■ Rule 11 requires an attorney to make a reasonable inquiry into the law prior to signing a pleading, motion, or other paper. The rule states, in part, "If a pleading, motion or other paper is signed in violation of this rule, the court . . . shall impose upon the person who signed it . . . an appropriate sanction, which may include an order to pay . . . the amount of the reasonable expenses incurred." Ark. R. Civ. P. 11; *Whetstone* v. *Chadduck*, 316 Ark. 330, 871 S.W.2d 583 (1994). The Trial Court has discretion in determining whether a violation occurred. *Whetstone* v. *Chadduck, supra; See also Bratton* v. *Gunn*, 300 Ark. 140, 777 S.W.2d 219 (1989). Only if this discretion is abused will we reverse. *Whetstone* v. *Chadduck, supra; Ward* v. *Dapper Dan Cleaners and Laundry, Inc.*, 309 Ark. 192, 828 S.W.2d 833 (1992). The Trial Court did not find a violation of Rule 11, and there is simply no evidence that the determination was an abuse of discretion.

English makes the separate contention that it was entitled to attorney's fees pursuant to Ark. Code Ann. § 16-22-309 (Repl. 1994) which provides for award of an attorney's fee when a claim is brought absent a justiciable issue. The statute describes a claim lacking a justiciable issue as one commenced "in bad faith solely for purposes of harassing or maliciously injuring another or delaying adjudication without just cause or that the party or the party's attorney knew, or should have known, that the . . . claim . . .

was without any reasonable basis in law or equity and could not be supported by a good faith argument of an extension, modification, or reversal of existing law."

■     Had discovery shown the feed which impacted the ostriches' stomachs to have been defective, perhaps by a greater presence of aflatoxin, an issue might have arisen as to how it appeared in the feed, and that could have raised questions about its handling and storage by English. There has been no showing of bad faith or harassment or that the claim was without "any reasonable basis."

### 4. Indemnity

English submits that it is entitled to indemnification under Ark. Code Ann. § 16-116-107 (1987). The statute provides that "a supplier of a *defective product* who was not the manufacturer shall have a cause of action for indemnity from the manufacturer of a *defective product* arising from the supplying of the *defective product*." [Emphasis added.]

■     When the language of a statute is plain and unambiguous, we give the language its plain and ordinary meaning. *Omega Tube & Conduit Corp.* v. *Maples*, 312 Ark. 489, 850 S.W.2d 317 (1993); *City of Fort Smith* v. *Tate*, 311 Ark. 405, 844 S.W.2d 356 (1992). In this instance, the defective product claim has failed.

Affirmed.

GLAZE and BROWN, JJ., dissent.

TOM GLAZE, Justice, dissenting. I join in Justice Brown's dissent, but I also believe this case must be reversed and remanded because the trial court utilized the wrong standard in granting the appellee's summary judgment. The majority opinion recognizes this point, states the trial court's use of the "substantial evidence" was incorrect, but then affirms the trial court's ruling, saying the error was not prejudicial. From the record, we cannot be sure the trial court was not requiring plaintiffs to prove their case by substantial evidence. That fact, alone, is sufficient prejudice.

BROWN, J. joins this dissent.

Robert L. Brown, Justice, dissenting. In the case at hand Dr. Mills, a veterinarian, was adamant throughout that impacted bird feed had caused the birds to die. He had performed the post-mortems on the birds and knew whereof he spoke.

On September 9, 1993, which was months before the first complaint was filed by the Capleners on January 31, 1994, Dr. Mills averred by way of affidavit:

> After the birds died, I posted them, *i.e.*, cut them open and examined them. They were all impacted with commercial bird feed. They did not have sufficient grass within them to cause a problem. There were no other foreign objects inside them. Their stomachs were swollen with food. They died from food impaction by commercial bird feed.
>
> . . . .
>
> I advised Don to change bird feed after a few of the ostriches died because I determined that the ostriches ate the food and the food impacted them, which caused their deaths.

On July 15, 1994, Dr. Mills's deposition was taken, and he testified that impaction killed the birds but that he did not know what caused the impaction.

Motions for summary judgment were filed by the appellees on August 15, 1994, and two days later on August 17, 1994, Dr. Mills averred again by way of affidavit:

> After reviewing my deposition, I discovered that my answers left it unclear as to my belief regarding cause of death of Don Caplener's ostriches.
>
> It is my belief that the primary cause of death of these birds was feed impaction resulting from indigestible feed. I believe a virus or bacteria contracted by any of these birds would have been a secondary infection that resulted from the feed impaction. I did not observe anything to indicate that these birds were suffering from shock or stress. On posting, these birds appeared generally healthy and I did not observe any other abnormalities.

For these reasons, I believe that there was something wrong with the commercial feed that prevented it from digesting properly. As I testified, I did not test the feed and could not say in what way the feed was defective.

On August 25, 1994, and August 26, 1994, the respective appellees moved to strike Dr. Mills's second affidavit. The trial court's letter opinion of September 6, 1994, struck the second affidavit and granted the appellees' motions for summary judgment.

The majority decision affirms the striking of the second Mills affidavit on the basis that it contradicts Dr. Mills's deposition. But there was a reason for the second affidavit. Dr. Mills is a veterinarian, not a chemist or toxicologist. He did not test the feed or know precisely how it was defective and why it impacted. Thus, he stated at deposition that he could not testify at trial what exactly was wrong with the feed. But he never wavered from his opinion that feed impaction caused the birds to die.

A reasonable explanation for a statement made in deposition seems perfectly permissible to me, and I would not decide this case by striking the second Mills affidavit. Moreover, there is still the first Mills affidavit where he unmistakably opined that the birds died of feed impaction and where he states that he advised the Capleners to change bird feed.

Admittedly, why the commercial feed impacted remains an open question. The affidavits supporting the appellees' motions for summary judgment discounted aflatoxin as a cause, as the majority opinion points out, but in appellants' second amended complaint allegations of adulterated feed go beyond the assertions related to aflatoxin. The appellants should have the right to further develop their case.

I would reverse the order of summary judgment and remand.

GLAZE, J., joins.