The Honorable Sharon Trusty State Senator Post Office Box 9026 Russellville, AR 72811
Dear Senator Trusty:
I am writing in response to your request for my opinion on the following questions:
 1. Would it be a conflict of interest for an individual who is a board director of both a bank and a nonprofit corporation, which leases a municipal utility from a city, to act on any of the nonprofit corporation's financial affairs which involve the bank where he is a director?
 2. If the answer is yes, would a conflict of interest also exist for like members of an intermodal board, economic development board or any board receiving public funds?
 3. Does a lease between a city and a nonprofit corporation, which contains a perpetual rollover clause that automatically adds one year to the lease agreement as long as neither party object to the rollover, violate the A.C.A. § 14-199-701(c) provision concerning leasing between two parties for more than 80% of the economic life span of the utility system?
 4. Is it legal for a city of the first class, which owns a water and sewer system and leases that system to a private nonprofit corporation under A.C.A. 14-199-701, to charge a franchise fee on the private nonprofit corporation pursuant to ACA 14-200-101, when the private nonprofit corporation is declared by ACA 14-199-701(b) to be an instrumentality of the city?
 5. Based on the same factual set up in the preceding question, is it legal for a nonprofit corporation to pass along the franchise fee to the customers of the utility that are inside the city limits?
RESPONSE
With respect to your first question, I believe a director of a nonprofit corporation that leases a city-owned utility is subject to the statutory conflict-of-interest provisions applicable to public officials and employees. He further owes fiduciary obligations both to the nonprofit corporation and any other organization he serves as a director, including any organization that contracts with the city or any instrumentality of the city. In my opinion, although determining whether a conflict of interest exists will always entail conducting an intense factual inquiry, the dual service referenced in your request raises serious ethical concerns under both sets of obligations. This same conclusion applies to the dual service referenced in your second question. With respect to your third question, only a finder of fact familiar with the entire lease could opine on the effect of what you characterize as "a perpetual rollover clause." However, assuming the clause indeed conflicts with the provision of A.C.A. § 14-199-701(c) limiting the term of a lease to 80% of the economic life span of the utility system, I believe the entire contract would be subject to challenge as failing to contain a material, enforceable contractual provision. As reflected in Ark. Op. Att'y Gen. No. 2003-196, I believe the answer to your fourth question is "yes." See A.C.A. § 14-200-101. As further reflected in my previous opinion, I believe the answer to your fifth question is likewise "yes," subject to the condition that the utility may only pass on this fee to customers living within the municipality. See A.C.A. §14-200-101(a)(1)(D).
Question 1: Would it be a conflict of interest for an individual who is aboard director of both a bank and a nonprofit corporation, which leases amunicipal utility from a city, to act on any of the nonprofitcorporation's financial affairs which involve the bank where he is adirector?
In my opinion, unless the city council by resolution declared otherwise, I believe this relationship might well constitute a conflict of interest that would preclude the bank and the nonprofit corporation from dealing with each other.
In light of your references in subsequent questions to A.C.A. §14-199-701 (Repl. 1998), I assume the lease at issue was authorized pursuant to that statute, which provides:
 (a) Any city of the first class, city of the second class, and incorporated town owning a waterworks system, sewer system, gas system, electric system, television signal distribution system, other municipal utility system, or any combination thereof, may lease such system or systems to any nonprofit corporation organized under the laws of the State of Arkansas, or may contract with any such nonprofit corporation, for the purpose of the management and operation of such system or systems for such period of time and upon such terms and conditions as may be deemed to be in the best interests of the city or town.
 (b) The nonprofit corporation shall manage and operate the utility system or systems solely on behalf of the city or town and shall be deemed an instrumentality thereof for such purpose.
 (c) No such lease or contract shall contain an option to purchase or otherwise transfer ownership to such utility system or systems, nor shall any such lease or contract have a term which is more than eighty percent (80%) of the reasonably expected economic life of the utility system or systems.
 (d) The directors of the nonprofit corporation shall be nominated by its members, and the members and directors shall be approved by the council, board of directors, or other like body in which the legislative functions of a municipality are vested and shall be residents of the city or town.
 (e) The provisions of subsections (b) and (d) of this section shall not apply to nonprofit corporations formed under the provisions of § 23-18-301 et seq.,[1] and nothing in this subchapter shall act to prevent or prohibit a city or town from entering into a lease or contract with such a nonprofit corporation for the purposes set out in subsection (a) of this section.
As provided in the highlighted provisions above, although the referenced "nonprofit corporation" that leases the city's utility system may be organized as a private entity, for purposes of its management of the system it is deemed an "instrumentality" of the city, whose members and board of directors are subject to city council approval. In my opinion, this designation effectively renders the corporation a public entity with respect to its operation of the utility. See Ark. Const. amend. 65(3)(b) (defining an "instrumentality" of a city as a "governmental unit"); A.C.A. § 15-5-103(18) (Supp. 2003) (defining an "instrumentality" of a city as a "political subdivision"). I believe this designation is significant because it renders the corporation's directors subject to the conflict-of-interest standard applicable to public officials, in addition to the standard of fiduciary obligation that any director owes to the corporation(s) he serves.
Several statutes set forth conflict-of-interest standards applicable to public officials. First, A.C.A. § 14-42-107(b) (Supp. 2003) provides:
 (1) No alderman, council member, official, or municipal employee shall be interested, directly or indirectly, in the profits of any contract for furnishing supplies, equipment, or services to the municipality unless the governing body of the city has enacted an ordinance specifically permitting aldermen, council members, officials, or municipal employees to conduct business with the city and prescribing the extent of this authority.
 (2) The prohibition prescribed in this subsection shall not apply to contracts for furnishing supplies, equipment, or services to be performed for a municipality by a corporation in which no alderman, council member, official, or municipal employee holds any executive or managerial office or by a corporation in which a controlling interest is held by stockholders who are not aldermen or council members.
In the situation you have described, I believe the director of the nonprofit corporation, which as an "instrumentality" of the city has a public aspect, would clearly qualify as an "official" subject to the proscription set forth in subsection (b)(1) of the statute just recited.[2]
Moreover, I believe a bank director should be classified as holding an "executive or managerial office" in the bank, thus meeting one of the two conditions set forth in subsection (b)(2) as possibly triggering the prohibition set forth in subsection (b)(1). As noted in Ark. Op. Att'y Gen. No. 97-120:
 [T]he terms "executive" and "managerial" are not defined in the statute. In the absence of a statutory definition, and in the absence of an ambiguity, the terms should be given their commonly understood meanings. See Ark. Dept. of Human Serv. v. Wilson, 323 Ark. 151, 913 S.W.2d 783 (1996); Caplenger v. Bluebonnet Mill. Co., 322 Ark. 751, 911 S.W.2d 586 (1995). The American Heritage Dictionary defines the term "executive" as "[o]f, pertaining to, capable of, or suited for carrying out or executing." It defines the term "managerial" as "[o]f, pertaining to, or characteristic of a manager or management." The term "management," in turn, is defined as "[t]he act, manner, or practice of managing, supervising, or controlling."
I believe these definitions clearly apply to the activities of a bank director.
Finally, in my opinion, the director of the municipal instrumentality would "be interested, directly or indirectly, in the profits of" a bank he likewise serves as a director. See Ark. Op. Att'y Gen. No. 2003-176
(opining that a member of the University of Arkansas Board of Trustees was "interested, either directly or indirectly" in a UCA contract with a bank he served as an officer). With regard to the implications of this interest, A.C.A. § 14-42-107(b)(1) prohibits a municipal officer or employee from engaging in business dealings with the city if that individual has an interest in the transaction unless the city council has enacted an ordinance that allows the transaction. However, subsection (b)(2) ambiguously defines what might be either one or two exceptions to this prohibition.
My predecessors have in the past taken different positions on the question of when the (b)(2) exception applies. The question in these opinions was whether the statutory exception will apply, thus permitting the contractual relationship even without city council approval, only if (1) the public servant having an interest in the transaction does not serve in a managerial or executive position with the contracting companyand the council or board members do not own a controlling interest in the contracting company; or (2) the public servant having an interest in the transaction does not serve in a managerial or executive position with the contracting company or the council or board members do not own a controlling interest in the contracting company.
Relying upon the fact that A.C.A. § 14-42-107(b)(2) uses the conjunctive "or" in setting forth the conditions that would lift the requirement of board approval of an interested transaction, two of my predecessors have adopted the latter of the alternatives set forth in the preceding paragraph. Ark. Ops. Att'y Gen. Nos. 90-132, 94-283 and 97-120. However, in the earliest of these opinions, my predecessor allowed that the following principle of statutory interpretation might apply to warrant a different conclusion:
 It has been held, however, that to carry out the general purpose and intent of the legislature, the words "and" and "or" are convertible. Shinn v. Heath, 259 Ark. 577, 535 S.W.2d 57 (1976). It has also been held, however, that the use of the words "and" and "or" interchangeably in a statute is permissible only where the context requires it to effectuate the intention of the legislature, or where not to do so would render the meaning of the statute ambiguous or result in an absurdity. Hines v. Mills, 187 Ark. 465(1933), and Beasly [Beasley] v. Parnell, 177 Ark. 912 (1928).
After undertaking a highly nuanced analysis, my predecessor opined: "Although it is tempting to read the word `or' in 14-42-107(b)(2) as an `and,' we cannot conclude that such a construction is necessary to give effect to the legislative intent, or to prevent an ambiguity or absurdity."
In Ark. Op. Att'y Gen. No. 2000-276, after offering a similarly detailed analysis, another of my predecessors drew a different conclusion, instead reading A.C.A. § 14-42-107(b) to mean that a municipality would be precluded from proceeding without council approval with any contract involving an interested city official or employee unless both of the conditions recited in subsection (b)(2) apply — i.e., that no municipal official or employee hold an executive or managerial position with the corporation seeking to contract with the city and that no member of the city council, either alone or in combination with any other member(s) of the council, own a controlling interest in the corporation seeking to contract with the city. My predecessor offered the following analysis in rejecting his predecessor's previous position that the "or" in the statute should be read as disjunctive:
 Such an interpretation would allow service on the city council by a person who exercises one type of control over a corporation with which the city does business simply because he does not also happen to exercise the other type of control over that organization. The exception appears to have been intended to allow service on the city council (without a special ordinance) by persons who are affiliated with corporations with which the city does business, but who exercise no substantial authority in those corporations.
In the most recent opinion to address the issue, then, my predecessor effectively concluded that legislative intent warranted converting the "or" in A.C.A. § 14-42-107(b) into an "and" under the principles of statutory construction recited above.
Although I agree with my predecessors that the issue is an extremely close one, I am inclined to concur with the analysis set forth in Opinion No. 2000-276. I agree with my more recent predecessor that the legislature's apparent purpose in enacting A.C.A. § 14-42-107(b) was to prohibit any transaction between a city and a corporation whose affairs are subject to strong influence by a municipal officer or employee with a direct financial interest in the contract unless the city council expressly approves the transaction. It strikes me as inconsistent with this purpose, for instance, to allow an unapproved transaction between a city and a corporation whose chief executive is an alderman. I believe it might indeed be classified as "absurd" (one litmus test for reading "or" as "and" under Hines, supra) to suggest that the ethical conflict inherent in such a contract would not exist so long as one or more members of the city council did not own a controlling share in the corporation. The inherent conflict arising from the chief executive's participation on both sides of this contract would not be mitigated in the least by the fact that no members of the city council exerted a controlling ownership interest in the contracting corporation. Given this fact, I believe logic suggests that the legislature intended to classify each of the two statutory contingencies — viz., a municipal official or employee's holding an executive or managerial position in the proposed contractor or one or more aldermen owning a controlling interest in the proposed contractor — as an independent bar to the corporation's contracting with the city without council approval. Having tentatively ventured this opinion, I must note that the issue is far from readily resolved, as my predecessors' disagreement reflects. Legislative clarification appears warranted.
You appear to assume in your question that if a conflict of interest exists, a municipal official might avoid the conflict simply by not participating in transactions between the two organizations. I do not believe this assumption is warranted. Pursuant to A.C.A. §14-42-107(b)(1), so long as the city council by resolution approved the transaction, it could proceed with or without the interested director's participation. However, if the city council did not provide such approval, the entire transaction would be prohibited either if any municipal official or employee held a managerial or executive position with the bank or if one or more aldermen held a controlling interest in the bank. With respect to the specific situation described in your request, only a finder of fact could determine the applicability of the statutory prohibition or the exceptions thereto as set forth in A.C.A. §14-42-107.
I should further note the potential application to your question of A.C.A. § 21-8-304(a) (Supp. 2003), which provides:
 No public official or state employee shall use or attempt to use his or her official position to secure special privileges or exemption for himself or herself or his or her spouse, child, parents, or other persons standing in the first degree of relationship, or for those with whom he or she has a substantial financial relationship that is not available to others except as may be otherwise provided by law.
This statute might be read as precluding a director of the nonprofit corporation referenced in your request from promoting or participating in the business the nonprofit corporation conducts with the bank which the individual also serves as a director. However, assuming the director were permitted to participate in business transactions between the two entities pursuant to A.C.A. § 14-42-107, I believe the phrase "except as may be otherwise provided by law" in A.C.A. § 21-8-304(a) might apply, meaning that that the dual director could participate in business dealings between the two entities. Again, making this determination will entail conducting a factual investigation of the sort I am neither authorized nor equipped to conduct.
Finally, regardless of whether the dual director might be authorized under these statutes to participate in the transactions at issue, he will continue to be constrained in his actions by his fiduciary duties to the two entities. As one of my predecessors noted in Ark. Op. Att'y Gen. No.2000-178:
 Black's Law Dictionary defines the term "fiduciary capacity" as follows:
 One is said to act in a "fiduciary capacity" or to receive money or contract a debt in a "fiduciary capacity," when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part. The term is nor restricted to technical or express trusts, but includes also such offices or relations as those of an attorney at law, a guardian, executor, or broker, a director of a corporation, and a public officer.
 Black's Law Dictionary (6th ed. 1990) (emphasis added).
Black's further describes a "fiduciary duty" as "the highest standard of duty implied by law." Id.
As my predecessor further noted, dual service on the boards of entities that are involved in transactions with each other is fraught with potential conflicts, given that the dual director owes a fiduciary duty of absolute loyalty to both entities involved in the transactions. I am unauthorized to offer private legal advice regarding the application of fiduciary principles when an individual undertakes dual service of the sort at issue. The individual in question should consult with private counsel to clarify the scope of his fiduciary obligations to the corporations he serves.
Question 2: If the answer is yes, would a conflict of interest also existfor like members of an intermodal board, economic development board orany board receiving public funds?
Although the inquiry in each instance will be intensely factual, I believe serving on the board of a bank while likewise serving on any of the referenced boards that does business with the bank might well offend the proscription against conflicts of interest.
An intermodal board is one formed pursuant to the Regional Intermodal Facilities Act (the "Act"), A.C.A. §§ 14-143-101 through -129 (Repl. 1998 Supp. 2003). Section 14-143-103 of the Code provides in pertinent part:
 (a)(1) Any two (2) or more municipalities, any two (2) or more contiguous counties, or any one (1) or more municipalities together with any one (1) or more contiguous counties, are authorized to create and establish an authority as prescribed in this chapter for the purpose of acquiring, equipping, constructing, maintaining, and operating regional intermodal facilities.
 (2) No county or municipality shall participate in such authority unless and until its governing body so provides by ordinance, and enters into an agreement with the other participating governmental units establishing the terms and conditions for the operation of the authority within the limitations provided in this chapter and such other laws of the State of Arkansas as may be applicable.
The Act defines the term "intermodal" to mean "one (1) or more modes of interconnected movement of freight, commerce, or passengers." A.C.A. §14-143-102(8). Pursuant to the Act, intermodal facilities authorities are expressly designated "public corporations," A.C.A. § 14-143-104; can be created only by ordinance of the participating governmental entities, A.C.A. § 14-143-103; are directed by a board appointed by the mayor(s) and county judge(s) of the participating entities, A.C.A. § 105; are authorized to accept municipal, county and state contributions, A.C.A. §§14-143-123 and -125; are authorized to issue tax-exempt bonds that qualify as "public instrumentalities," A.C.A. § 14-143-121; and are invested with a series of essentially governmental powers, including the power to tax users of the system. A.C.A. § 14-143-109. Given these statutory conditions, I believe an intermodal facility authority is a public entity subject to public conflict of interest restraints.
However, notwithstanding the fact that an intermodal facility authority is clearly a public entity acting on behalf of its constituent political subdivisions, it is just as clearly a regional, as distinct from a purelylocal, entity, raising the question of whether the ethical strictures applicable to municipal officials discussed in my response to your first question will apply.[3] In my opinion, they will not. As previously noted, an intermodal facility authority is a public corporation independently performing what are essentially governmental functions. Given the fact that the board exercises this independence not on behalf of any particular locality, but rather on behalf of the entire region it represents, I believe it would be inappropriate to subject the board's members to the ethical constraints that bind particular municipal or county officials or employees. Rather, I believe the pertinent statutory ethical provisions are those set forth at A.C.A. § 21-8-304(a), which, as noted above, provides:
 No public official or state employee shall use or attempt to use his or her official position to secure special privileges or exemption for himself or herself or his or her spouse, child, parents, or other persons standing in the first degree of relationship, or for those with whom he or she has a substantial financial relationship that is not available to others except as may be otherwise provided by law.
In my opinion, this statutory proscription would preclude an intermodal facility director from voting on any matter relating to the facility's relationship with a bank the individual also serves as a director. However, I do not believe this statute would preclude the intermodal facility board from transacting business with the bank.
In my opinion, the common law proscription against conflicts of interest would further preclude an intermodal facility director from participating in decisions relating to a bank he also serves as director. As one of my predecessors noted in Ark. Op. Att'y Gen. No. 2002-273:
 The common law prohibition against conflicts of interest is reflected in the following description of the public policy underlying the principle:
 A public office is a public trust . . . and the holder thereof may not use it directly or indirectly for personal profit, or to further his own interest, since it is the policy of law to keep an official so far from temptation as to insure his unselfish devotion to the public interest. Officers are not permitted to place themselves in a position in which personal interest may come into conflict with the duty which they owe to the public, and where a conflict of interest arises, the office holder is disqualified to act in the particular matter and must withdraw.
 67 C.J.S. Officers § 204. See also Ops. Att'y Gen. 2001-042; 2000-072; 99-349; 98-275; 94-283; and 94-446, citing Van Hovenberg v. Holman, 201 Ark. 370, 144 S.W.2d 719 (1940); Madden v. United States Associates, 40 Ark. App. 143, 844 S.W.2d 374 (1992); Acme Brick Co. v. Missouri Pacific R.R., 307 Ark. 363, 821 S.W.2d 7 (1991); and 63A Am. Jur.2d, Public Officers and Employees § 321.
I believe a similar conclusion applies to a dual director serving both a bank and an economic development board established pursuant to A.C.A. §14-166-201 et seq. (Repl. 1998 Supp. 2003). As one of my predecessors noted in Ark. Op. Att'y Gen. No. 94-030, an economic development district, like an intermodal facility authority, is distinctly regional in its nature:
 Although a majority of the board is comprised of local officials, there is no required concurrence or approval of the districts' actions by the counties or cities included in the multi-county region. Thus, in my opinion, it cannot reasonably be concluded that the districts simply act for the counties and cities, i.e., as merely administrative arms of city or county government. See generally Adams v. Bryant, 236 Ark. 859, 370 S.W.2d 432 (1963) (holding that a light and water commission created by city ordinance was simply an agent of the city where its exercise of legislative authority required city council approval). The districts act, instead, as agents of the regions whose interests are affected by the activities pursued under 14-166-201 et seq. They derive their authority from the legislature, not from the cities and counties. While it may be accurate to say that the elected officials on each district's board together represent local governmental interests, there is no distinct representation of any local unit of government. The board also represents economic development organizations and other organizations broadly representative of diverse community interests. A.C.A. 14-166-203(b).
An economic development authority is thus a public, regional entity, and as such its directors are subject to the ethical proscriptions I have discussed as applicable to intermodal facility directors.
Finally, I am unable to address in the abstract what ethical constraints might apply to a dual director of a bank and of "any board receiving public funds." The category of boards "receiving public funds" covers an extremely wide spectrum, spanning from the boards of clearly private grant recipients, whose ethical obligations would frequently be only fiduciary in nature, to the boards of political subdivisions, whose ethical obligations would be dictated by the pertinent statutes discussed above. Only a finder of fact reviewing particular transactions between particular boards would be in a position to determine what ethical strictures might apply. In this regard, I will note that the Arkansas Ethics Commission is statutorily charged with investigating and prosecuting a broad range of ethical violations. See A.C.A. § 7-6-217
(Supp. 2003).
Question 3: Does a lease between a city and a nonprofit corporation,which contains a perpetual rollover clause that automatically adds oneyear to the lease agreement as long as neither party object to therollover, violate the A.C.A. § 14-199-701(c) provision concerning leasingbetween two parties for more than 80% of the economic life span of theutility system?
I am unable to provide a definitive answer to this question without reviewing all the terms of the lease itself. However, assuming the lease indeed provides for a term that violates the statutory limitation of the lease to 80% of the reasonably expected economic life of the system, I believe the entire contract would be subject to challenge as failing to include a legally enforceable provision stating the term of the lease.
Subsection 14-199-701 of the Code (Repl. 1998), which authorizes a lease of the sort at issue in your question, provides in pertinent part:
 (a) Any city of the first class, city of the second class, and incorporated town owning a waterworks system, sewer system, gas system, electric system, television signal distribution system, other municipal utility system, or any combination thereof, may lease such system or systems to any nonprofit corporation organized under the laws of the State of Arkansas, or may contract with any such nonprofit corporation, for the purpose of the management and operation of such system or systems for such period of time and upon such terms and conditions as may be deemed to be in the best interests of the city or town.
* * *
 (c) No such lease or contract shall contain an option to purchase or otherwise transfer ownership to such utility system or systems, nor shall any such lease or contract have a term which is more than eighty percent (80%) of the reasonably expected economic life of the utility system or systems.
(Emphasis added.) The latter highlighted provision reflects a public-policy concern that the parties not be bound to a lease agreement relating to a no-longer-functioning facility.[4]
I have not been provided a copy of the lease, and I am not authorized to determine whether the contract reflects an unequivocal agreement that the lease will continue indefinitely unless one of the parties indicates otherwise. However, I can and will opine that if the contract indeed purports to authorize continuing the lease beyond 80% of the reasonably expected economic life of the utility, the provision stating as much will be subject to challenge as offending the direct mandate of A.C.A. §14-199-701(c), possibly resulting in the rescission of the entire contract. As previously noted, I have not been provided a copy of the lease and would be unauthorized in any event to construe its terms. The parties to the lease can seek local counsel to review the terms of the lease and, if appropriate, to amend its terms to conform to the law. As the court observed in Shumpert v. Arko Telephone Comm., Inc.,318 Ark. 840, 843, 888 S.W.2d 646 (1994), nothing precludes contracting parties from subsequently modifying their contract, even if the modification involves changing the terms of a written contract by oral agreement.Accord O'Bier v. Safe-Buy Real Estate, 256 Ark. 574, 509 S.W.2d 292
(1974); compare Ark. Op. Att'y Gen. No. 2003-197 (opining that of a city and a utility have set a particular franchise fee by contract, the parties might change that fee by mutual assent).
Question 4: Is it legal for a city of the first class, which owns a waterand sewer system and leases that system to a private nonprofitcorporation under A.C.A. 14-199-701, to charge a franchise fee on theprivate nonprofit corporation pursuant to ACA 14-200-101, when the privatenonprofit corporation is declared by ACA 14-199-701(b) to be aninstrumentality of the city?
In my opinion, the answer to this question is "yes." I addressed this precise question in the attached Ark. Op. Att'y Gen. No. 2003-196 and will not repeat my analysis here, instead merely restating the following conclusion:
 Even though the lessee corporation is deemed an "instrumentality" of the city pursuant to A.C.A. § 14-199-701, it nevertheless qualifies as a "public utility" under the applicable statutory definition set forth at A.C.A. § 14-200-101. As such, it is subject to a franchise fee pursuant to A.C.A. § 24-200-101(a)(1)(A).
Question 5: Based on the same factual set up in the preceding question,is it legal for a nonprofit corporation to pass along the franchise feeto the customers of the utility that are inside the city limits?
In my opinion, the answer to this question is likewise "yes," subject to the condition that the utility may only pass on this fee to customers living within the municipality. Subsection 14-200-101(a)(1)(D) of the Code (Supp. 2003) provides:
 Nothing herein shall limit the authority of the public utility to collect from its customers residing in each municipality an amount which equals the franchise fee assessed by the municipality on the public utility[.]
In Opinion No. 2003-196, I offered the following analysis of this statute:
 In my opinion, the highlighted language is unambiguous in directing that the utility can recoup its franchise fee only from city residents. You have not asked, and I will not address, whether thus distinguishing between customers residing within and outside city limits might be characterized as unfair. I will merely opine that, as written, the statute authorizes a utility to recoup its franchise fee only from customers living within the city.
I continue to subscribe to my earlier opinion.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
Enclosure
[1] The referenced subchapter deals with the organization and powers of electric cooperatives.
[2] Municipal "officials" were recently included within the statutory proscription with the enactment of Acts 2003, No. 1299, § 1.
[3] The rules addressing conflicts of interest at the county level are codified at A.C.A. § 14-14-1202 (Repl. 1998). This statute authorizes a quorum court to sanction a county transaction in which a county official has a direct interest if "unusual circumstances" dictate that it would be in "the best interest of the county" to enter into the transaction.
[4] As the court noted in Arkansas Blue Cross Blue Shield v.Hicky, 50 Ark. App. 173, 177, 900 S.W.2d 598 (1995):
 The general rule is that a contract is against public policy if it is injurious to the interests of the public, or contravenes some established interest of society or some public statute, or is against good morals, or tends to interfere with the public welfare. Guaranty Nat'l Ins. v. Denver Roller, Inc., 313 Ark. 128, 854 S.W.2d 312
(1993). The public policy of this state is found in its Constitution and statutes. Id. at 139.