PHILLIP T. WHITEAKER, Judge
Appellant TMG Cattle Co., Inc. ("TMG"), appeals the order of the Phillips County Circuit Court granting the motion for summary judgment filed by appellee Parker Commercial Spraying, LLC ("Parker"). On appeal, TMG contends that the circuit court erred in finding that there were no genuine issues of material fact. We agree, and we reverse and remand.
I. Background
TMG is a cattle business. Parker is a business providing spraying services to farmers. On February 17, 2016, Parker sprayed urea fertilizer in a wheat field adjacent to a field where TMG's cattle were grazing. On February 20 or 21, TMG discovered eighteen dead cows on its property, all located in and around a pond adjacent to the wheat field where Parker had applied the urea fertilizer. TMG filed a complaint against Parker, alleging that Parker's spraying of toxic chemicals in the field near where the cows were grazing was the proximate cause of the deaths of the cattle.
Parker answered and moved for summary judgment, arguing that TMG was unable to prove that the cows' deaths were caused by the fertilizer application. In seeking summary judgment, Parker asserted that the deposition testimony of TMG's veterinarian, Dr. Holt Pittman, did not definitively link the cows' deaths to the consumption of urea fertilizer. After a hearing, the circuit court entered an order granting Parker's summary-judgment motion, finding that there was "no genuine issue as to any material fact and that based on the undisputed material facts, [Parker] is entitled to judgment as a matter of law." TMG filed a timely notice of appeal.
II. Standard of Review
A circuit court may grant summary judgment only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. Harrisburg Sch. Dist. No. 6 v. Neal , 2011 Ark. 233, 381 S.W.3d 811. The party seeking summary judgment has the burden of establishing a prima facie entitlement to summary judgment. Once this has been established, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. Id. On appellate review, we determine whether summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. Campbell v. Asbury Auto., Inc. , 2011 Ark. 157, 381 S.W.3d 21. We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. Id. Our review focuses not only on the pleadings, but also on the affidavits and documents filed by the parties. Cent. Okla. Pipeline, Inc. v. Hawk Field Servs., LLC , 2012 Ark. 157, 400 S.W.3d 701. The purpose of summary judgment is not to try *757 the issues, but to determine whether there are any issues to be tried. Davis v. Schneider Nat'l, Inc. , 2013 Ark. App. 737, 431 S.W.3d 321.
III. Analysis
In its brief on appeal, TMG breaks its argument down into several subpoints, asserting that the circuit court erred (1) in ruling there were no issues of material fact, (2) in not resolving remaining doubts against the moving party, and (3) by improperly imposing the burden of proof on the nonmoving party; moreover, TMG contends that even if it was proper to shift the burden to it, it still demonstrated that material questions of fact remained. The fundamental crux of its argument, however, is that the circuit court erred in finding that there were no genuine issues of material fact. We agree.
TMG's complaint raised claims of negligence against Parker. To prevail on a claim of negligence, TMG must prove that Parker owed a duty to it, that Parker breached that duty, and that the breach was the proximate cause of TMG's damages. Lloyd v. Pier W. Prop. Owners Ass'n , 2015 Ark. App. 487, 470 S.W.3d 293. Parker's summary-judgment motion specifically challenged TMG's evidence regarding proximate cause and did not question the issues of duty and breach. We therefore focus solely on the question of proximate cause.
Proximate cause is defined as "that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." Pollard v. Union Pac. R. Co. , 75 Ark. App. 75, 79, 54 S.W.3d 559, 562 (2001). Proximate cause in a negligence action may be shown from circumstantial evidence, and such evidence is sufficient to show proximate cause if the facts proved are of such a nature and are so connected and related to each other that the conclusion therefrom may be fairly inferred. Wallace v. Broyles , 331 Ark. 58, 67, 961 S.W.2d 712, 715 (1998) (citing White River Rural Water Dist. v. Moon , 310 Ark. 624, 839 S.W.2d 211 (1992) ). Proximate causation is usually an issue for the jury to decide, and when there is evidence to establish a causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury. City of Caddo Valley v. George , 340 Ark. 203, 9 S.W.3d 481 (2000).[1]
*758 On the issue of proximate causation, Parker submitted the depositions of Dr. Holt Pittman, TMG's veterinarian, and Hunter Jackson, the driver of the tractor that sprayed the fertilizer. Dr. Pittman examined the dead cows on February 25, which was four or five days after the cows' bodies were discovered. He observed eighteen dead female cows, all averaging a weight of approximately 600 pounds. The dead cows were all congregated around a "bar hole," or pond, located on TMG's property adjacent to the wheat field. The fact that all the dead cows were congregated in and around a watering hole indicated to Dr. Pittman that all of the cows died from the same cause. Dr. Pittman suspected the death of the cows could be associated with urea poisoning based on the location of their dead bodies: the cows were located around the pond, which was adjacent to the wheat field. Dr. Pittman placed significance on this because of the recent application of urea to the wheat field, as evidenced by tractor tracks in the wheat field adjacent to the cow pasture. He further explained that if the cows ate urea, it would have made them extremely thirsty, so the cows' first instinct would have been to get a drink of water. Dr. Pittman opined that a 600-pound cow would have to consume approximately 200-300 grams of urea to reach a toxic dose.
To confirm his suspicions, Dr. Pittman obtained tissue samples from a cow's rumen (a part of the cow's stomach) and eye fluids and tested them for ammonia toxicity or ammonia toxicosis. Dr. Pittman admitted that the tests showed a normal level of ammonia in the cow's tissues at the time of testing. He explained, however, that when a cow dies from, or is exposed to, a toxic amount of ammonia, the increased levels of ammonia will only be present for about twenty-four hours. After that time, the ammonia would reach equilibrium and be at a steady state. For that reason, testing for ammonia toxicity is valuable only within twelve to twenty-four hours after death, and Dr. Pittman was therefore not surprised that the results showed a normal level of ammonia.
Dr. Pittman acknowledged that he did not see any visible fertilizer pellets in the cow's rumen or in the wheat field. He also did not take any soil samples, plant-tissue samples, water samples, or samples of any other food that the cattle had been fed. He also agreed that it would have been impossible to observe any objective markers of ammonia toxicosis during his necropsy, as any such clues had given way to decomposition. He further conceded that there could have been other sources of the urea in the cattle, such as a dietary supplement or from runoff into the pond from fertilizer applications elsewhere, but he added that to his knowledge, TMG did not use urea as a supplement. Finally, Dr. Pittman acknowledged that cows could build up a tolerance to urea if they were exposed to it over time, and he did not know whether these particular cows had done so, nor did he know what the urea content of the cows' diet was.
Dr. Pittman's ultimate conclusion, however, was that he was 95 percent certain that the cows died from ammonia toxicosis, despite the lack of laboratory evidence. He opined as follows:
Based upon the lab results [a definitive diagnosis of ammonia toxicosis ] is impossible to do at this point in the game. My opinion is that the most logical explanation is ammonia, is the urea, the cattle ingested urea. Urea is converted to ammonia by the bacteria in the rumen. The *759 ammonia reached toxic levels and the cattle died very quickly. They laid there for three or four days. The samples that we obtained were useless. The history fits. The exposure fits. The fact that there was a large-there was a group that died [at] the same time, rapidly, and appeared to be of the same cause, fits. And there were no other dead cattle in the area. I haven't been made aware of any other outbreak of disease or dead cattle. So, therefore, my opinion and the opinion of the pathologist at the lab and the chemist was that these cattle died from ammonia.
....
[T]he applicator applied urea to the wheat field. The herdsman reported that the urea was also applied to the pasture where the cattle were, the edge of the pasture. And shortly thereafter, a day or two after that, they all were found dead.
In support of its motion for summary judgment, Parker also offered the deposition of Hunter Jackson, the driver of the tractor used to spread the fertilizer on the adjacent field. Jackson stated that he was spraying urea and ammonia sulfate on about eight acres adjacent to the cow pasture and that he spread about 100 pounds of urea fertilizer per acre. He used a sprayer that distributed the urea pellets over a distance of 77 or 78 feet, or about 36 feet to either side of and behind the tractor. Jackson acknowledged photographs of the field that showed tractor-tire tracks "somewhat close" to the fence between the properties. Finally, Jackson conceded that cattle could die from eating enough urea, although he did not see any cows on the other side of the fence the day he was spraying.
Based on the depositions and the arguments of counsel, the circuit court granted Parker's motion for summary judgment. In its statements at the conclusion of the summary-judgment hearing, the court expressed concern that a jury would not "be able to do anything but speculate" as to what happened to the cows. The court concluded that "something happened but I don't know what ... [and therefore] I don't think the plaintiff has met his burden of proof." We cannot agree with the circuit court's conclusion.
The circuit court appears to have considered that the question for its consideration, on summary judgment, was whether there was enough evidence to submit to a jury. This was error. The question in this case, as in all summary-judgment cases, is whether there are issues to be tried. If there is any doubt as to whether there are issues to be tried, a summary-judgment motion should be denied. Tullock v. Eck , 311 Ark. 564, 845 S.W.2d 517 (1993). In this case, Parker, as the moving party, bore the burden of showing that there were no genuine issues of material fact. TMG, as the party opposing summary judgment, was entitled to have all doubts and inferences resolved in its favor. Summary judgment is not proper if reasonable minds could reach different conclusions when given the facts. Id.
On the facts presented in this case, we conclude that reasonable minds could reach different conclusions. We are guided by an instructive case from New York: Lehoczky v. New York State Electric & Gas Corp. , 117 A.D.2d 870, 498 N.Y.S.2d 585 (1986). In that case, the appellate division of the New York supreme court reversed a grant of summary judgment in favor of a utility company that had sprayed chemical herbicides along a right-of-way. Evidence in that case showed that Lehoczky's cows had grazed along that right-of-way within days or weeks of the herbicide spraying, and numerous cows became malnourished or died within months. Necropsies of the dead cows indicated that the cows had died of malnutrition, parasitism, *760 and pneumonia. Lehoczky , 117 A.D.2d at 871, 498 N.Y.S.2d at 586.
The trial court granted the utility company's motion for summary judgment, and Lehoczky argued on appeal that the court erred in refusing to give him the benefit of every favorable inference to be drawn from the pleadings, affidavits, and depositions. Id. at 872, 498 N.Y.S.2d at 586. The appellate court agreed, citing Lehoczky's affidavit that outlined the chain of events that led to his cows' deaths, his expert's affidavits indicating that one of the cows had "acted like it was poisoned," another affidavit asserting that before the spraying, there had been no problems at all with the herd's health, and a veterinarian's affidavit opining that there was a "possibility that [the cows] died as a result of herbicide poisoning." Id. at 872-83, 498 N.Y.S.2d at 587. The appellate court stated:
While defendants challenge each of these expert affidavits as framed in terms of mere possibilities and thus conclusory in nature, looking to the substance and not the form, we find that each reflected an acceptable degree of certainty so as to be, in their totality, probative of the issue presented. As indicated in the [expert's] affidavit and recognized in [the veterinarian's] own report, the herbicides in question do not bioaccumulate in the body tissue. This being the case, it is not surprising that their presence was not detected in the necropsies performed, and it is doubtful that any direct evidence of herbicide poisoning was available. Moreover, since anorexia may also be a symptom of herbicide poisoning, the existence of malnutrition in several cattle is not necessarily dispositive because this diagnosis is as consistent with herbicide poisoning as it is with improper maintenance. Indeed, the records submitted by plaintiffs as to feed and health care reflect a schedule of proper maintenance. Taken in context, plaintiffs' affidavits clearly presented an arguable issue of fact as to causation sufficient to preclude an award of summary judgment.
Id. at 873, 498 N.Y.S.2d at 587.
Similarly, here, Dr. Pittman's deposition testimony "reflected an acceptable degree of certainty" that presented a material question of fact as to cause of the cows' deaths. The testimony indicated that the cows were healthy before they died; the deaths were sudden; all eighteen cows died at the same time in the same area; urea fertilizer had been sprayed within days of the deaths in the immediate vicinity of where the cows died; and urea ingestion could cause the death of a cow. Although this evidence does not prove to an absolutely certainty that the cows ate the urea, which led to their deaths, that is not the issue to be addressed at the summary-judgment stage of the proceedings. "[T]he standard to be applied in summary judgment cases is whether there is evidence sufficient to raise a fact issue rather than evidence sufficient to compel a conclusion on the part of the factfinder." Wallace v. Broyles , 331 Ark. at 65, 961 S.W.2d at 715 (citing Caplener v. Bluebonnet Milling Co. , 322 Ark. 751, 911 S.W.2d 586 (1995) ). Applying the appropriate standard, we conclude that there is a factual question as to the issue of proximate cause in this case. The circuit court therefore erred in granting Parker's summary-judgment motion, and we reverse and remand.
IV. Attorney's Fees and Costs
Finally, we note that Parker has filed a motion for attorney's fees and costs associated with the filing of its supplemental abstract and addendum, which it contended was necessitated by deficiencies in TMG's abstract. We agree that TMG's abstract and addendum are deficient, in that TMG improperly included copies of deposition transcripts in its addendum, rather *761 than abstracting them as required by Arkansas Supreme Court Rule 4-2(a)(5)(A). In response to that deficiency, Parker submitted a supplemental abstract that properly abstracted the deposition testimony, which was essential for our understanding of the case. Supreme Court Rule 4-2(b)(1) provides that when an appeal is considered on its merits involving a flagrantly defective abstract which has been brought to an appellate court's attention by the appellee who has opted to submit a supplemental abstract in its brief, the appellate court may impose costs to compensate for the other party's noncompliance with the Rule. See Rosser v. Columbia Mut. Ins. Co. , 55 Ark. App. 77, 928 S.W.2d 813, 816 (1996). We therefore award $1,000 in attorney's fees and $31.36 in costs.
Reversed and remanded; attorney's fees and costs awarded.
Gruber, C.J., and Hixson, J., agree.

Parker took the position below and does so again on appeal that the question of causation must be examined under the analysis applicable to "toxic-tort" cases. In such cases, to survive a motion for summary judgment, a plaintiff is required to prove the following elements: (1) that the plaintiff was exposed to a toxic substance made or used by the defendant, (2) with sufficient frequency and regularity, (3) in proximity to where the plaintiff worked or lived, (4) such that it is probable that the exposure to the defendant's products caused the plaintiff's injuries. Green v. Alpharma, Inc. , 373 Ark. 378, 388, 284 S.W.3d 29, 37 (2008) ; Chavers v. Gen. Motors Corp. , 349 Ark. 550, 79 S.W.3d 361 (2002) (adopting the test in an asbestosis case). Applying this standard, Parker contends that the evidence TMG introduced below failed to satisfy the "frequency, regularity, and proximity" test, and therefore, summary judgment was appropriate because TMG could not prove the causation element of its negligence claim. See Dunaway v. Garland Cty. Fair & Livestock Ass'n, Inc. , 97 Ark. App. 181, 189, 245 S.W.3d 678, 685 (2006) ( "If a party responding to a summary-judgment motion cannot meet proof with proof on an essential element of his claim, the movant is entitled to judgment as a matter of law.").
We disagree with this analysis. In a toxic-tort case, the plaintiff's injuries are generally the result of a series of events occurring over a considerable length of time and under different circumstances. See Ga.-Pac. Corp. v. Carter , 371 Ark. 295, 303, 265 S.W.3d 107, 113 (2007) ; Baker v. Wyeth-Ayerst Labs. Div. , 338 Ark. 242, 992 S.W.2d 797 (1999). This is not a toxic-tort case; this is not a case involving a series of events occurring over a considerable length of time. This was a single event in which eighteen cows died, apparently at once and apparently of the same cause. We therefore decline to consider or apply the "frequency, regularity, and proximity" test to this factual scenario.